IN RE APPLICATION OF EILEEN E. LAKEY FOR A WRIT OF HABEAS CORPUS. EILEEN E. LAKEY, APPELLANT, V. MABEL ALICE GUDGEL ET AL., APPELLEES.

62 N. W. 2d 525

Filed February 5, 1954. No. 33422.

R. L. Haines, for appellant.

Dryden, Jensen & Dier and Arthur A. Weber, for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is a habeas corpus action brought by Eileen E. Lakey, sometimes known as Ellen E. Lakey, as plaintiff or relator in the district court for Brown County to obtain the custody of a minor son, Charles William Switzer, Jr., from Mabel Alice Gudgel and Amos Gudgel, wife and husband, defendants or respondents.

The relator's petition is to the effect that the respondents have the custody of the minor child in question and unlawfully and forcibly detain him in their home under the pretext that they have furnished board and lodging and necessaries of life for him in the past.

The respondents, by separate answers, allege the relator abandoned the child to the care and control of the respondent Mabel Alice Gudgel who has cared for and provided for the child; that the child has remained in the household of these respondents and has been treated as one of the family; and that it would be detrimental to the child's welfare and health to be removed. The prayers of these answers are to leave the custody of the child with these respondents.

The trial court heard the case on its merits and thereafter rendered a decree finding generally in favor of the

respondents and against the relator, awarded the custody of the child to the respondents until further order of the court, dismissed the petition for a writ of habeas corpus on the part of the relator, and taxed the costs to the relator. The relator filed a motion for a new trial which was overruled, and relator appeals.

At the outset it may be said that a prior divorce decree determining custody of a minor child, although binding as between the parents, is not a bar to a subsequent habeas corpus proceeding to determine custody, since the decree did not consider the position of the state as parens patriae and the welfare of the child. See Wear v. Wear, 130 Kan. 205, 285 P. 606, 72 A. L. R. 425. And, a divorce decree is not conclusive in a subsequent habeas corpus proceeding where the parties to the two proceedings are not the same. See, Barnes v. Morash, 156 Neb. 721, 57 N. W. 2d 783; 39 C. J. S., Habeas Corpus, § 46, p. 584.

. It will be observed that in the instant case the parties are not the same as in the divorce proceedings. In this case the mother of the child is seeking its custody against these respondents, as reflected by the pleadings heretofore set out. The former husband of the relator is not a party to this action and seeks no relief.

The legal principles on which the determination of this case must depend have been well stated in the opinions of this court. In Norval v. Zinsmaster, 57 Neb. 158, 77 N. W. 373, 73 Am. S. R. 500, it was said: "The statute and the demands of nature commit the custody of young children to their parents rather than to strangers, and the court may not deprive the parent of such custody unless it be shown that such parent is unfit to perform the duties imposed by the relation or has forfeited the right." See, also, In re Application of Schwartzkopf, 149 Neb. 460, 31 N. W. 2d 294.

In the supplemental opinion in Gorsuch v. Gorsuch, 143 Neb. 578, 11 N. W. 2d 456, which was an action to modify a portion of a decree relating to the custody of a child, it was said: "The proper rule * * *, where the

custody of minor children is involved, is that the custody of the child is to be determined by the best interests of the child, with due regard for the superior rights of fit, proper, and suitable parents. Where both parents are affirmatively found to be unfit, the custody of the child will be determined solely by the welfare and best interests of the child. * * * But this court has never deprived a parent of the custody of a child merely because, on financial or other grounds, a stranger might better provide." See, also, Barnes v. Morash, *supra.*

Custody of a child of tender years should be awarded to the mother, unless it is shown that she is unsuitable or unfit to have such custody, or through some peculiar circumstance is unable to furnish a good home. See, In re Application of Reed, 152 Neb. 819, 43 N. W. 2d 161; Bath v. Bath, 150 Neb. 591, 35 N. W. 2d 509; Hodges v. Hodges, 154 Neb. 178, 47 N. W. 2d 361; Barnes v. Morash, *supra.*

We believe the afore-cited authorities disclose the manner in which the writ of habeas corpus involving the custody of a minor child is to be considered in this jurisdiction.

It appears that the case of Kaufmann v. Kaufmann, 140 Neb. 299, 299 N. W. 617, contains language that is in conflict with the rules as announced in the foregoing-cited authorities. Any such language appearing in Kaufmann v. Kaufmann, *supra,* contrary and in conflict with the rules hereinbefore announced governing cases of this nature is overruled.

The relator will hereafter be referred to as the appellant and the respondents as the appellees, and we will refer to Mrs. Eckhout as Mrs. Gudgel as she appears herein.

At the time of trial the appellant was 30 years of age. She was married when she was 17 years of age to Charles William Switzer who was then 19 years of age, and while she was attending high school and he was a member of the Civilian Conservation Corps camp at

Broken Bow. This marriage was unsuccessful, and the parties moved from place to place where the husband obtained employment. There were charges and counter-charges on the part of each of the parties as against each other which did not add to nor lend to a stabilized home but produced difficulties and tribulations that were not beneficial to the minor children of the parties. Four children were born to this union, Robert Lee on October 26, 1941, Rose Ella on August 1, 1942, Everett Owen on April 12, 1943, and a child, the subject of this action, on February 7, 1947. At the time of trial all of the children except the subject of this action were in the custody of the father, this marriage having resulted in a divorce and the father, having married again, was living in the State of Missouri.

It appears from the record that in 1944, the appellant's husband was inducted into the military service. She was to reside in Miller, Nebraska, in a rented house. She got along very well for a period of a year when a young lady who was having difficulty with her mother moved in with the appellant without objection on the part of the mother. This created adverse talk in the village with reference to the appellant. In September or October 1945, the appellant's husband returned from military service and took up residence with her. Difficulties arose between the parties. The appellant developed a lung hemorrhage and went to the Nebraska Hospital for the Tuberculous at Kearney. She returned home in April 1946. Difficulties again arose between the parties and she was requested by her husband to leave. The child who is the subject of this action was born after the separation and was named after his father in an attempt to effect a reconciliation which failed.

Other details of the lives of these parties need not be discussed. More particularly, we think the following evidence is of importance. In September 1947, the appellant met Mrs. Eckhout who is now Mabel Alice Gudgel, appellee, who married Amos Gudgel on October 7, 1949.

Mrs. Eckhout at that time was running a nursery in Kearney. By arrangements with the appellant, Mrs. Eckhout came to see the appellant, and it was finally determined that Mrs. Eckhout would take charge of the child, the subject of this action, for a dollar a day. The record further discloses that the appellant was in various places such as Tucson and Phoenix, Arizona, and many other places which need not be mentioned, and had made arrangements at one time to marry a man and establish a home. This plan failed. During this period of time Mrs. Eckhout had full charge and care of the child. On occasions the appellant paid Mrs. Eckhout in part for the care of the child, but in fact showed a desire not to retain the custody of her own child but was willing to let Mrs. Eckhout retain such custody, which she did.

The appellant met her present husband in a night club in Carlsbad, New Mexico, in the latter part of February 1948. They were married at Artesia, New Mexico, on March 11, 1948. In May 1948, the appellant went to Kearney by bus. She and Mrs. Eckhout discussed the possibility of taking the child home with her. Mrs. Eckhout refused to let the child go with the appellant. The appellant at that time owed Mrs. Eckhout $300 for the care of the child, and Mrs. Eckhout did not trust her to pay this amount. The appellant did not contact any police officer or her attorney in Kearney. She apparently relied upon the advice of an attorney in Carlsbad who told her that she would have to acquire residence in Nebraska in order to bring an action to obtain the custody of her child. She contacted the Federal Bureau of Investigation and was informed that this was not in their line of work. In October 1952, she wrote to a welfare agency at Kearney and received advice that an action for a writ of habeas corpus would be the proper remedy.

The reason she gave for not being able to pay Mrs. Eckhout was that her husband, prior to her marriage to him, had his money invested in an oil-drilling project

and was unable to obtain money with which to pay Mrs. Eckhout. After she returned to Carlsbad, she sent Mrs. Eckhout $12.50 for the care of the child.

She told of her place of residence in Carlsbad and described the furnishings therein. She further testified that she had a little boy 3½ years old; that when she first went to Carlsbad she worked as a practical nurse; that after her child was 3 years old she worked again in the same occupation; and that in the last year she had earned $600. Her husband was employed in a potash mine and received $325 to $375 a month. She and her husband had talked about the matter of obtaining the child in question. She stated that he was her child and she wanted him. She also testified that she had joined the church of the Assembly of God, and had contributed $150 to that church in the past year.

The appellant's husband testified as to the circumstances under which he met the appellant; that he was 47 years of age; that he had been married in 1939 and obtained a divorce in 1946; and that he earned from $325 to $375 a month. He further testified that he remembered his wife being in Kearney in May 1948; that he was working the day shift and returned home about 4:30 or 5 p. m.; that on a Saturday night there was a telegram sent by his wife requesting $300; and that everything was closed and he was unable to do anything about this matter at that time or on the following day which was Sunday. His wife returned to Carlsbad either on that Sunday night or the next Monday morning. Shortly thereafter his father had a paralytic stroke and he was required to borrow money to get his father to Hot Springs. In addition, his money had been tied up in an oil-drilling venture which he thought was good but which turned out bad, and he lost $4,000 in the venture. His wife had some interest in this venture also. He further testified that he purchased a farm of 380 acres in Arkansas for $5,500, upon which he owes $2,800. His residence in Carlsbad is valued at $8,500, and there is

$4,569 against it. He carries $14,000 life insurance. His home was purchased in 1949. He further testified that he would be pleased to adopt the child in question and that he had been a resident of Carlsbad for 12 years, including 2 years in military service in the engineer corps. He further testified that he and appellant offered to pay Mrs. Gudgel the $300 after this action was commenced.

The appellant introduced depositions by persons residing in Carlsbad to the effect that while the appellant worked in the hospital there as a practical nurse connected with general floor duty, her work was satisfactory, her moral reputation was good, and that she was clean and even tempered. There is also testimony of a minister of the church that she attended that the appellant was a member of his church, bore a good reputation, and attended church regularly. Another witness who worked with the appellant's husband and had known him for a considerable length of time testified to the good reputation of the appellant and her husband and the manner in which they clothed and took care of their little boy. Other witnesses, for the most part merchants with whom the appellant and her husband traded, testified to the appellant's good moral character, that the son of the parties was well provided for and well clothed, and that the appellant's husband bore a good reputation in the community.

The appellee, Mabel Alice Gudgel, who was formerly Mrs. Eckhout and will hereinafter be referred to as Mrs. Gudgel, testified that she was 46 years of age; that her former husband died on December 15, 1947; and that she then resided in Kearney and conducted a nursery in a home which was owned by her husband. She had adopted two children. She became acquainted with the appellant when the appellant called her, the object being to make arrangements to care for the minor child here involved. Arrangements were made for the care of this child, the appellant to pay $12.50 a week for such

service.  This arrangement occurred on July 7, 1947. In October 1947, the appellant asked Mrs. Gudgel to get the baby ready to go with her.  The appellant brought the baby back almost immediately and told Mrs. Gudgel that she could not care for him.  She used a bad name for the child and said she could not do anything for him.  She asked Mrs. Gudgel to take him back, to which Mrs. Gudgel replied that she would, under the same circumstances and arrangements.  The appellant then "went west" and it was quite awhile before Mrs. Gudgel saw her again.  She did not write nor send any money for the child's keep.

When Mrs. Gudgel first got the care of the baby it had no clothing, and Mrs. Gudgel purchased and provided clothing that would be adequate.  She was not paid for this.

When the appellant returned from her western trip she was going to leave again.  This was shortly before December 15, 1947.  Appellant then returned on January 20, 1948.  She did not write during this time nor send any money to Mrs. Gudgel.  The appellant told Mrs. Gudgel that she was going to Wisconsin, and took the baby with her.  She partially paid for the care of the child at that time.  This was January 20, 1948.  She returned the child January 27, 1948.  The child recognized Mrs. Gudgel and called her "Mama."  The child was sick with fever, had some difficulty with his legs, and was unable to walk for 2 or 3 months.

Upon her return from Wisconsin, the appellant told Mrs. Gudgel that she did not have any more use for the child, could not take care of him, and that he was Mrs. Gudgel's to keep.  Mrs. Gudgel told her that would be all right, but she would like to have her money or some arrangement made for the keep of the child.  To this the appellant said she would pay her when she got a job.

Mrs. Gudgel did not see the appellant again until May 1948, when the appellant came to Kearney and told Mrs. Gudgel she was married.  At that time Mrs. Gudgel

was employed at the hospital during the nighttime and had a lady staying in the home during this time because Mrs. Gudgel wanted to be with the children during the daytime. She was required to work and support herself. When Mrs. Gudgel came home the appellant was there, and she told Mrs. Gudgel that she had someone who would give her $500 to adopt the child. Mrs. Gudgel told her she should not do that, that it was not right, and if she did not want the baby she, Mrs. Gudgel, would certainly keep him. She had had the care of him this long and had learned to love him as her own child. The appellant laughed a little and wanted to know how much she owed Mrs. Gudgel. It amounted to a little over $300. Mrs. Gudgel then testified that the appellant called her husband at Carlsbad, or sent a telegram, she did not know which. Anyway, at the conclusion of the conversation the appellant slammed up the receiver and using profanity told Mrs. Gudgel she did not have any money and that Mrs. Gudgel could have the child, and she went out of the house mad. Mrs. Gudgel never saw her again until after this action was brought.

Mrs. Gudgel kept her home together, with her two daughters and this little boy. After she married Amos Gudgel they moved to Ainsworth, taking her two daughters, Sharon and Sharrill, and this little boy referred to as Jackie, with them. Later she and her husband moved to Johnstown where he owns a modern home consisting of 10 rooms which she described, and testified that the children each have separate rooms and there are a spare bedroom and other accommodations in the house. As to the schools, the school at Johnstown goes to the eighth grade. After completion of the eighth grade, the children who go to high school are transported in a bus to Ainsworth, 10 miles distant.

The appellee, Amos Gudgel, testified that he was 62 years of age; that he had five boys and two girls of his own; and that he had known his present wife 5 or 6 years previous to their marriage. He further testified

that the child in question recognized him as his father and Mrs. Gudgel as his mother; that no members of the family have any objection to the arrangement as made; that Jackie was treated as one of the family; that he is willing to adopt the child and make him one of his own as far as heirs are concerned; and that there is no objection to his adopting Jackie and giving him the same rights as the other children. He further testified that in his opinion if Jackie was removed from the appellees' custody it would have an ill effect upon his health and would be bad for him. He further testified that he was active in business matters and generally supervised a 1,458-acre ranch southeast of Johnstown. One of his sons manages the ranch which is fully stocked with cattle.

Jackie's grades, as testified to by his teacher, were satisfactory and above average. The minister of the Methodist church testified as to his visits to the appellees' home in the past 2 years, that the home was kept in an immaculate condition, the environment was excellent, and that Jackie was a well-behaved child and very happy.

In addition to the foregoing testimony, several neighbors testified, as did members of the Gudgel family. Suffice it is to say that all of the witnesses called in behalf of the appellees testified that Mrs. Gudgel was an immaculate housekeeper, bore a good reputation in the community, was a 4-H leader, and possessed a great deal of thoughtfulness for children; that most of the children in the town visit her home quite often; that Amos Gudgel was a good business man and bore a good reputation in the community; and that Jackie was happy and was treated and considered as a member of the Gudgel family.

The first husband of the appellant, by deposition, testified to the effect that the appellant did not take proper care of the minor children of the parties; that she neglected them and failed to properly feed them;

that she ran up bills which he had to pay upon his return from the army, none of which were for the proper kind of food the children should have; that the children were dirty and not cleaned up; and that on one occasion the appellant returned home with the children at 3 o'clock in the morning in an intoxicated condition. There are other matters detailed by this witness which need not be discussed.

It might be stated at this point that any allotment made by the appellant's first husband while he was in the military service for the benefit of this minor child, while the child was under the care of Mrs. Gudgel when she was Mrs. Eckhout, was satisfactory with him. In addition, no fault was found on the part of the appellant with the manner in which Mrs. Gudgel had cared for this child.

All of the matters testified to in the deposition of the first husband as to the manner in which the appellant provided for and cared for the minor children were corroborated by other witnesses. In addition, witnesses testified that the appellant's reputation in the community was bad; that she had on occasions left town and placed the children in the care and custody of the mother of the young lady who lived with the appellant; and that she had been with other men on occasions. For the most part, the appellant denied this testimony, stating that her trip out of town on one occasion was to visit relatives, and that the man who took her out of town on one occasion had worked for her father, had some difficulty, and as a consequence was sent to the penitentiary.

The appellees argue, and we agree, that the child is now, and ever since coming to their home has been, cared for, reared, and trained in a most exemplary and devoted manner, and the child will be safe, healthy, moral, and happy if his raising and education remain their responsibility.

It is also apparent from the evidence that the child

in question had adequate and proper dental and medical care. The appellant has paid very little, if any, attention to the child, has paid for no clothing or doctor bills, and has, according to the evidence, avoided all responsibility of parenthood except that she paid Mrs. Gudgel part of the keep of the child, but paid no part when she was financially able to do so. The appellant has, in fact, as shown by the evidence, abandoned this child and forfeited any right she might have to his custody. The trial court so determined. We are loath to disturb the happy relations that exist at the present time from the facts as we understand them from the record.

"Where the evidence on material questions of fact in a case such as the instant case is in irreconcilable conflict, this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying, and must have accepted one version of the facts rather than the opposite." Barnes v. Morash, *supra*.

From an analysis of the evidence and the authorities herein cited, we conclude that the judgment of the trial court should be affirmed.

AFFIRMED.