STATE OF NEBRASKA EX REL. O'NEILL F. HAMILTON ET AL.,
APPELLANTS, V. CHARLES A. BOILER, GUARDIAN, ET AL.,
APPELLEES.
67 N. W. 2d 458

Filed December 17, 1954.   No. 33554.

*Burbridge & Burbridge,* for appellants.

*Swarr, May, Royce, Smith & Story,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE,
YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

This is a habeas corpus action brought in the district
court for Douglas County by the paternal and maternal

grandparents and paternal uncles of Christyne Rae Mc-Coy, a minor then of the age of about 5½ years, against Charles A. Boiler, her foster father and guardian. The purpose of the action is to obtain custody of the minor child for the relators, or one of them, and to take her from the respondent. The trial court denied the writ on the ground that the child was not being unlawfully detained by respondent. Relators thereupon filed a motion for new trial and have appealed to this court from the trial court's overruling thereof.

"Habeas corpus is a proper remedy to determine the controversy concerning the rights of custody of infants." Hanson v. Hanson, 150 Neb. 337, 34 N. W. 2d 388. See, also, In re Application of Schwartzkopf, 149 Neb. 460, 31 N. W. 2d 294; Lemke v. Guthmann, 105 Neb. 251, 181 N. W. 132.

"* * * Such proceedings are governed by considerations of expediency and equity, and should not be bound by technical rules of practice." Barnes v. Morash, 156 Neb. 721, 57 N. W. 2d 783. See, also, In re Application of Reed, 152 Neb. 819, 43 N. W. 2d 161; In re Application of Schwartzkopf, *supra*.

Respondent, in response to the writ issued, filed a plea in abatement and, on the basis thereof, moved that the writ be quashed. This plea he renewed in his answer and return. The plea is based on the following facts: On May 27, 1953, respondent filed a petition in the county court of Douglas County to be appointed guardian of Christyne Rae McCoy, a minor. On the same day he was appointed her guardian by that court. For the county court's authority to do so, see section 38-104, R. R. S. 1943. On May 28, 1953, respondent qualified as guardian of the person and estate of the minor. Under the circumstances here this gave him the lawful custody of Christyne. See § 38-108, R. R. S. 1943. Thereafter, on August 24, 1953, the parties who are relators herein filed a motion in the county court to vacate and set aside the guardianship. A hearing was

had on this motion on August 29, 1953. It was overruled. No appeal has been taken therefrom.

Ruling on this plea and motion was deferred by the trial court and none was ever made directly thereon except whatever may be the effect in that regard of the court's denial of the writ, which is based on the court's finding that the respondent was not unlawfully detaining the child.

We held in In re Application of Schwartzkopf, *supra:* "The writ of habeas corpus is not a corrective remedy, and is never allowed as a substitute for appeal or proceedings in error."

Here the parties fully tried the case on its merits and no objection was made to that procedure by either. Apparently the court determined it on that basis. In a comparable situation in State ex rel. Bize v. Young, 121 Neb. 619, 237 N. W. 677, wherein we considered the appeal on its merits, we said: "Without announcing it as having the force of a binding rule in this jurisdiction, it may be said, in the discharge of this high trust and duty, American courts of excellent standing unquestionably adhere to the principle that, 'So far as the interests and rights of the child itself are concerned the court is not bound by any previous adjudication.' 10 Standard Ency. of Procedure, 953." The situation here being comparable, we shall follow the same course.

In order to better understand the problem presented we think it advisable to fill in some background. Jeannine, the daughter of O'Neill and Alma Hamilton of Omaha, Nebraska, was born on August 13, 1929. On March 22, 1947, she was married to Dr. Raymond McCoy, a son of George and Selma McCoy of near Tecumseh, Nebraska. Two children were born to this marriage: Christyne Rae, a daughter, on February 11, 1948, and Denise, a daughter, on February 28, 1950. Denise died on April 16, 1950. Dr. and Mrs. Raymond McCoy went to Europe in July 1949, he being then in the military service of his country. On shipboard, while traveling

to Europe, both became seriously ill, he being stricken with poliomyelitis. This illness resulted in their early return to this country, arriving back here on August 28, 1949. The doctor sufficiently recovered to open up an office for the practice of medicine at Tecumseh, Nebraska. Shortly after doing so he suddenly died on July 3, 1951, of a heart attack. Jeannine and her infant daughter, Christyne, shortly thereafter returned to her parents' home in Omaha, where they all lived together at 5018 Cass Street. This was in September 1951. Dr. McCoy had three brothers; namely, Don of Omaha, Wayne of Tecumseh, and George of Lincoln. These brothers are all married and have families. All of the foregoing blood relatives are the relators in this proceeding.

Respondent, Charles Boiler, was born on November 6, 1927, to Charles and Josephine Boiler. His father was accidentally drowned in 1938 and thereafter he, his sister, and their mother had to make their own living. The mother never remarried. He was graduated from Abraham Lincoln High School in Council Bluffs, Iowa, in June 1945. He thereafter, on July 3, 1945, volunteered his services to his country by enlisting in the United States Marine Corps and served therein until August 21, 1946, when he was honorably discharged. In the fall of 1947 respondent entered the University of Omaha under the GI Bill of Rights. He attended the University during the school years of 1947-1948, 1948-1949, 1949-1950, and then during the summer session of 1950. Meanwhile, on January 21, 1948, he had enlisted for 4 years in the United States Marine Corps Reserves. On October 11, 1950, he was called to active duty and sent to Korea. He there served his country in active front-line duty for almost 6 months until he was wounded for the second time. As a result thereof he was released from active duty on November 2, 1951, although he suffered no permanent ill effects from the wounds received. He thereupon immediately obtained employment. On Janu-

ary 20, 1953, he was honorably discharged from the United States Marine Corps Reserves. The record shows that at all times since his father's death respondent has worked at every opportunity to support himself and obtain an education.

About February 1, 1952, respondent resumed his studies at the University of Omaha. There he renewed his acquaintance with Jeannine who was also attending the University. They had first met in the fall of 1951. Shortly thereafter they were married. They were married on April 25, 1952, in the Trinity Lutheran Church in Omaha. They first lived at 5018 Cass Street but in August 1952 moved to a duplex at 3552 North 60th Street in Omaha which is still the Boiler home. After the marriage respondent continued his education but Jeannine dropped her schooling. Respondent completed his education the forepart of July 1952, obtaining a degree of Bachelor of Science in Education. Thereafter, on July 21, 1952, he obtained employment with the Mutual Benefit Health and Accident Association of Omaha and has continued working for the company ever since.

A child was born to this marriage on December 20, 1952. It was a boy whom they named Jeffrey. Jeannine suddenly died on May 26, 1953. She apparently died from a sudden respiratory failure secondary to a compression of the brain stem. Respondent testified her death was immediately preceded by a convulsive attack. It seems that following the death of her baby Denise on April 16, 1950, Jeannine became subject to periodic convulsive seizures resulting in fainting spells. The record shows she first consulted Dr. Lehnhoff, her personal physician, about this condition in March 1951. These seizures occurred intermittently during 1951, seldom in 1952, but more often beginning with the forepart of February 1953. After Jeannine died respondent continued to maintain the home. His mother moved in with him and he hired a housekeeper. This trouble apparently came to a head in the forepart of August 1953

when respondent would no longer let Christyne go to the home of the Hamiltons or let them visit her. The reason for this latter action on respondent's part is hereinafter fully discussed.

The evidence presents two contrasting pictures and in view thereof the following principle has particular application: "Where the evidence on material questions of fact in a case such as the instant case is in irreconcilable conflict, this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying, and must have accepted one version of the facts rather than the opposite." Barnes v. Morash, *supra.* See, also, Lichtenberg v. Lichtenberg, 154 Neb. 278, 47 N. W. 2d 575; Lakey v. Gudgel, 158 Neb. 116, 62 N. W. 2d 525.

After their marriage the Boilers lived a normal happy life such as we usually think of in connection with newly married couples. This included their attending numerous social functions. Into this family Christyne was accepted as their own child and she received and returned the love and affection of both. This love and affection between the child and respondent has continued since the mother's death. In fact it was the wish of the mother and the desire of respondent that he adopt Christyne. They consulted an attorney for this purpose. This would undoubtedly have occurred except for an unfortunate misunderstanding on their part that such adoption would stop certain payments the child was receiving from the government based on her natural father's death. They never learned of this misunderstanding in Jeannine's lifetime. Consequently this wish and desire of these parties was never carried out although in this regard Jeannine requested of respondent a promise that if anything ever happened to her that he would raise both children. This he promised her he would do. After her death respondent filed a petition in the county court of Douglas County for the purpose of adopting

Christyne. That action is apparently still pending. While the normal happy life of this couple was momentarily disrupted in March 1953 when Jeannine consulted an attorney about a divorce this incident was almost immediately forgotten by both. In fact at the time of her death Jeannine had been pregnant for about a month.

After the unfortunate and untimely death of his wife respondent made satisfactory arrangements for maintaining his home. The home is an attractive duplex located in a newly developed area. It is in a very pleasant neighborhood with wide streets and well-kept lawns. The home itself is comfortably and attractively furnished. It is well kept and run with ease and without confusion or frustration. Christyne has her own room. In the neighborhood there are many children of Christyne's age with whom she can and does play. The child appears to be well kept and is normal and healthy in every respect. She is well behaved and happy.

During her lifetime the mother enrolled Christyne in the kindergarten at Brownell Hall and she started attending on April 6, 1953. It was the mother's desire that Christyne should attend Brownell Hall for the first eight grades of her education. This desire the respondent is fulfilling and the child is presently attending that school where she seems to be well adjusted to her surroundings.

The natural father and mother of Christyne were married in a Lutheran church, she having been baptized and raised in that faith, and they had Christyne baptized therein. The mother had expressed her desire to respondent to have her children raised in that faith. Since the mother's death Christyne has been and is regularly attending Sunday school conducted by the Immanuel Lutheran Church located at 60th and Military Streets, respondent taking her there every Sunday. It is also respondent's intention to have Jeffrey baptized and raised in the Lutheran faith, although he, at the present time, does not belong to any church.

A court may not deprive a parent of the custody of his child unless it be shown that such parent is unfit to perform the duties imposed by the relation or has forfeited the right. See, Lemke v. Guthmann, *supra;* In re Application of Schwartzkopf, *supra;* In re Guardianship of Herten, 127 Neb. 88, 254 N. W. 698.

We mention this principle here in view of respondent's son, Jeffrey, and what is hereinafter said in that connection.

However, where both natural parents are dead, the custody of the child will be determined solely on the basis of what is for the best interests of the child. See, Gorsuch v. Gorsuch, on rehearing, 143 Neb. 578, 11 N. W. 2d 456; Lakey v. Gudgel, *supra.*

In such a situation the welfare of the child is the primary consideration to which all other considerations must yield. See, In re Guardianship of Herten, *supra;* Steward v. Elliott, 113 Neb. 421, 203 N. W. 580; Barnes v. Morash, *supra.*

As stated in Steward v. Elliott, *supra,* quoting from Schroeder v. State, 41 Neb. 745, 60 N. W. 89: " 'In a controversy for the custody of an infant of tender years, the court will consider the best interests of the child, and will make such order for its custody as will be for its welfare, without reference to the wishes of the parties.' "

Under the situation here the following language from Kaufmann v. Kaufmann, 140 Neb. 299, 299 N. W. 617, has application: "The question involves the study of the proposed home itself, and its entire surroundings, the temporal welfare of the child, as to food, clothing, discipline, and, if of tender years, careful nursing when required, and medical attention. Then the court must consider its spiritual and religious care and upbringing, and whether it will have loving care, with understanding and affection: * * *."

In this regard we said in In re Guardianship of Herten, *supra:* "In considering the proper custody of minor

children, the expressed wish of a dying father should always be given great weight by the court, but it does not relieve the court from the responsibility of determining from all the evidence the one question of paramount consideration, i.e., what is now for the best interests of the child."

However, while in no sense controlling, a court should, in arriving at its decision, consider the natural parents' religious beliefs and their desires in that regard. See State ex rel. Bize v. Young, *supra*.

We have also said that unless their best interests absolutely require it be done that children of tender years should not be separated from each other or from those to whom they have become attached. See, In re Guardianship of Herten, *supra;* Kaufmann v. Kaufmann, *supra*.

Is respondent a fit and proper person to have the custody of the child? The evidence shows he is a fine young man of splendid moral character. He would appear to be a good example of young American manhood. He has served his country faithfully and well and by his own industry has prepared himself for his life's work. We certainly think he is a fit and proper person for that purpose.

Would it be for the child's best interests to remain in his custody? We have already fully discussed the home in which she would live, the education she would receive, and the religious belief in which she is being raised. We have, also, related the fine relationship and affection that exists in the home between all the members thereof, particularly between Christyne, Jeffrey, and respondent. The record shows that respondent has made fine progress in his chosen field of work and is fully capable of financially maintaining his home at the standard it has been and he will, undoubtedly, raise it far above that level.

Because of what we have hereinbefore set forth, we have come to the conclusion, all things considered, that it would be for the best interests of Christyne to leave her in the custody of respondent, where she has been

since May 1952, and let her grow up there with Jeffrey, her half brother, to whom she has become very closely attached. We recognize relators introduced evidence contrary to the findings we have herein made but we think our findings reflect the situation as it actually exists. In arriving at our decision we have not overlooked nor failed to consider that the relators are all blood relatives of Christyne and all have good homes in which Christyne could be raised but she cannot be raised in more than one home. Christyne should be permitted to have normal relations with these relatives by reasonable visitations in their homes, if they so desire, or by their visiting her in respondent's home. Respondent has expressed his approval of such relations and his willingness to see that it is fulfilled.

However, in this regard, we wish to make the following observation: It is apparent the maternal grandmother has pronounced likes and dislikes of people and in this regard does not always practice self-restraint. She first met respondent when he came to her home to court her daughter. This was in the forepart of February 1952. At that time she developed a pronounced dislike for him. She classified him in a very undesirable category and in no uncertain language advised him thereof. This unfortunate statement by her was undoubtedly the beginning of the strained relationship that has continued to exist between the two. After Jeannine's death this continued dislike caused her to try to poison Christyne's mind against respondent at every possible opportunity. This action on her part resulted in respondent denying her the right to see Christyne or having Christyne visit in her home. We think the record justifies the action respondent took. Unless the maternal grandmother can curb this tendency respondent would be fully justified in continuing to deny her the privilege of seeing the child. Only time can answer this question.

Much is said of what the relators testified they intended to do with the property Christyne inherited from

her father and mother if they, or any one of them, were given her custody. Her estate is under guardianship in the county court of Douglas County and subject to the supervision of that court. It can only be lawfully expended in such manner and for such purposes as that court may lawfully authorize. We are not here concerned with that question.

The record is voluminous and we have not endeavored to set it out in detail. To do so would serve no useful purpose. We find the custody of Christyne should be left with respondent and that, in view thereof, the action of the trial court denying the writ should be and is affirmed.

AFFIRMED.