T., PLAINTIFF, v. H., DEFENDANT.

Superior Court of New Jersey
Chancery Division

Decided June 17, 1968.

*Mr. William F. Tompkins* for plaintiff. (*Messrs. Lum, Biunno and Tompkins,* attorneys).

*Mr. Burrell Ives Humphreys* for defendant. (*Messrs. Hoffmann, Humphreys and Lafer,* attorneys).

CONSODINE, J. C. C. (temporarily assigned). Plaintiff seeks custody in New Jersey of minor children as opposed to custody with the mother, now remarried to a Gentile, and living in Western Idaho. Both parties are of the Jewish faith and want the children to be brought up in that faith. They included a provision to that effect in their separation agreement.

Northern New Jersey offers every facility toward the cultivation of their faith in the children. Temples, Hebrew schools, and extra-religious facilities abound. Idaho offers the town of Kellogg (population 5,300) in which the two children and their mother would be the only Jews. There are but two temples in that state, the nearer one being almost 300 miles away with a congregation of less than 200. To the west, in Washington, and 70 to 80 miles away by automobile, is the nearest temple of less than 200 families. Of Idaho's population, 692,000, only 500 or .07% are Jews. 67 *M. Fine, American Jewish Yearbook* 81 (1966); *Goldstein, American Jewish Organizations Directory* (1957).

The question here is—are the religious education and religious environment of the children, eight and ten, an im-

portant though not controlling factor in this case in the determination of custody?

■ Generally, our courts do not intervene in the religion of children in custody cases. Religion usually follows custody. *Donahue v. Donahue,* 142 *N. J. Eq.* 701 (*E. & A.* 1948); *Esposito v. Esposito,* 41 *N. J.* 143, 146 (1963).

■ Nevertheless, in awarding the custody of an infant, the religious training of the child is appropriately an element which may be considered among all the circumstances of gradational significance promoting the general welfare of the infant. *Wojnarowicz v. Wojnarowicz,* 48 *N. J. Super.* 349, 354 (*Ch. Div.* 1958); *Scanlon v. Scanlon,* 29 *N. J. Super.* 317, 326 (*App. Div.* 1954).

Although we have no cases directly in point to guide the court, it is clear that it may weigh religion in accordance with what is best for the happiness and welfare of the children as an important though not controlling factor in the awarding of custody. *Boerger v. Boerger,* 26 *N. J. Super.* 90 (*Ch. Div.* 1953).

Cases in other jurisdictions are more explicit than our holdings. They are summarized in 66 *A. L. R.* 2d 1610 as follows:

"Even in the absence of any particular issue as to whether the child should be raised in one religion or another, the courts in awarding custody have referred to the good religious standing or qualification of the custodian chosen . . . *or that in the home chosen the child would have superior facilities for church or religious training*". (Emphasis added)

Religious training is "most important and a factor which must be given the most serious consideration in child custody cases." *Commonwealth ex rel. Bendrick v. White,* 403 *Pa.* 55, 169 *A.* 2d 69, 73 (*Sup. Ct.* 1961).

A court should consider the religious beliefs of the parents and their desires concerning the children. *State ex rel. Hamilton v. Boiler,* 159 *Neb.* 458, 67 *N. W.* 2d 426, 431 (*Sup. Ct.* 1954). In *Commonwealth ex rel. Ackerman v. Ackerman,*

204 *Pa. Super.* 403, 205 *A. 2d* 49 (*Super. Ct.* 1964), the court inferred that religion will dominate the custody issue when there is a contractual agreement of the parents that the child be brought up as a Jew.

See also *Dansker v. Dansker,* 279 *S. W. 2d* 205 (*Mo. Ct. App.* 1955) (custody denied on the ground, among others, that if the children were moved from St. Louis to Pratt, Kansas, "the surroundings would be strange for [them] with no synagogue closer than seventy-five miles") ; *Sigesmund v. Sigesmund,* 115 *Cal. App. 2d* 628, 252 *P. 2d* 713 (*D. Ct. App.* 1953) (referring to the fact that one parent regularly took the children to Sunday school) ; *State ex rel. Bize v. Young,* 121 *Neb.* 619, 237 *N. W.* 677 (1931) (where the court considered that the foster parents "sympathetically cherished, encouraged and developed the religious teaching" imparted to the child in her natural home) ; *State ex rel. Bonsach v. Campbell,* 134 *Fla.* 809, 184 *So.* 332 (*Fla. Sup. Ct.* 1938) (referring to religious instruction) ; *Commonwealth v. Sheftic,* 178 *Pa. Super.* 649, 115 *A. 2d* 861 (*Super. Ct.* 1955) (which discussed the nearness of the child's present home to the church attended), and *Fannett v. Tompkins,* 49 *S. W. 2d* 896 (*Tex. Civ. App.* 1932) ("the opportunity for Christian culture and training" was a major factor in determining custody). See also *Gluckstern v. Gluckstern,* 220 *N. Y. S. 2d* 623 (*Sup. Ct.* 1961).

While mixed marriages between faiths are of no more concern to courts than inter-racial marriages, the court cannot ignore the view that

"if * * * a Jew who marries a Gentile continues to live in a Jewish environment, the chances are that the family will remain Jewish. But, if the environment is non-Jewish, the prospects are exactly the reverse. The results of studies showed that the number of mixed marriages in the agrarian part of the country was larger than in the cities."

"* * * The number of Jews leaving the Jewish Community after marriage to a non-Jew is higher than that of the non-Jews entering the Jewish Community after marriage to a Jew."

42

*Sherman, The Jew Within American Society, pp.* 37, 39, 189 (1961).

██ The answer to the posed question is in the affirmative and clearly carries our law beyond the proposition that religious education is never more than an element of consideration. Religious education, considered in the best interest of children, may become an important factor in deciding custody.

On this, and other grounds, judgment of custody to plaintiff.