MARY CORNELIA MARCUS, APPELLANT, v. MR. AND MRS. JAMES D. HUFFMAN, APPELLEES.

194 N. W. 2d 221

Filed February 10, 1972. No. 37995.

Corrigan, Dowd & Naviaux, for appellant.

Robert T. Finn, for appellees.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, and CLINTON, JJ.

McCOWN, J.

This is a habeas corpus action in which the petitioner,

Mary Marcus, sought to recover possession of her infant son, Lawrence William Marcus, from the respondents, Mr. and Mrs. James D. Huffman. The district court for Holt County determined that Mr. and Mrs. Huffman should have custody of the child, denied the writ, and dismissed the case. The mother has appealed.

Petitioner Mary Marcus was married to one Tommy Marcus in California on October 13, 1967. Tommy Marcus is the son of Mrs. James D. Huffman, one of the respondents. Lawrence William Marcus, the child who is the subject of this controversy, was born on May 11, 1969. Andrew, an older illegitimate son of Mary Marcus, was adopted by Tommy Marcus after the 1967 marriage. On January 24, 1969, and prior to the birth of Lawrence William Marcus, Mary Marcus began divorce proceedings against Tommy Marcus in the Superior Court for San Diego County, California. Efforts at reconciliation under court supervision and otherwise followed and continued up to and after the birth of Lawrence. Some time prior to June 15, 1969, in connection with one of the efforts at reconciliation, Tommy Marcus made arrangements with his mother, Mrs. Huffman, to take the two children to Nebraska for a time while the Marcuses attempted reconciliation once more. They hoped thereafter to come to Nebraska and establish a home for themselves and the children. On June 15, 1969, James D. Huffman flew to Los Angeles. Mary Marcus and Tommy Marcus delivered the two children to him in the Los Angeles airport together with their clothing, and Mary Marcus advised him of the feeding habits of the children. James D. Huffman then brought both Marcus children back to O'Neill, Nebraska, together with a third child unrelated to any of them. Andrew Marcus at that time was a little over 3 years old and Lawrence was only a month old. The reconciliation efforts failed in approximately 2 weeks. Mary Marcus then borrowed some money from her mother and drove to O'Neill, Nebraska, with her 14-year-old sister

to get the children. They arrived on July 3, 1969. She went to the trailer house of the Huffmans in O'Neill, Nebraska, where she found Andrew playing in the yard and picked him up. She went into the house and told Mrs. Huffman that she had come for her children. Mrs. Huffman told her she could not have them, but she took Andrew anyway and started to drive back to her motel. She was arrested by the sheriff who advised her that she could be charged with kidnapping, but she was permitted to call her attorney in California. After some undisclosed discussions, the sheriff advised her that Mrs. Huffman had agreed that she could take Andrew but that she would be charged with kidnapping if she attempted to obtain Lawrence. Mary Marcus attempted to employ counsel in O'Neill, but was unable to do so. She then returned to California with Andrew.

On July 30, 1969, an interlocutory decree of divorce was entered by the Superior Court for San Diego County, California. That decree awarded Mary Marcus the care, custody, and control of the two children, restrained Tommy Marcus from having any contact with the minor children, and specifically provided that he should have no rights of visitation without specific order of the court. Final decree was entered July 22, 1970.

Mary Marcus testified that she telephoned on several occasions to inquire about the health of her son and to request his return. She had to leave messages at the trailer court for Mrs. Huffman to return the calls because she could not obtain the telephone number from the operator. Mr. Huffman testified that the Huffman telephone was changed to an unlisted number in June or July of 1969, because they had received many calls where there was only breathing on the other end of the line when they answered. Mary Marcus' telephone calls to the Huffmans were never returned or answered. She also wrote letters to the Huffmans on several occasions and telegraphed on several occasions. There was no response to her letters or telegrams. Mary Marcus sent

several gifts to Lawrence which were received by the Huffmans but there was no acknowledgment of them to her.

This action was begun on September 1, 1970, and order entered directing the issuance of the writ for production on September 4, 1970. Mary Marcus Townsend again came to Nebraska for the hearing on September 4, 1970, but the Huffmans had previously departed with Lawrence for a vacation in Arkansas. She returned again in October for this hearing.

At an undisclosed age somewhere between 11 and 14, Mary Marcus attempted suicide by slashing her wrists. At approximately age 16, she was kept in a juvenile home for 2 or 3 days for possession of a marijuana cigarette. At age 16, she became the mother of Andrew, an illegitimate child. She lived with Tommy Marcus before their marriage on October 13, 1967, when she was 17 years old. After the birth of her first child, she completed her high school education at an adult public high school in San Diego. This history of Mary Marcus' background prior to her marriage to Tommy Marcus comes solely from the testimony of Mary Marcus.

The only testimony other than her own relating to Mary Marcus' fitness to have the custody of her child came from Mr. Huffman. Mr. Huffman testified that on one occasion, a week or two after the birth of Lawrence when the Huffmans were visiting in the home of the Marcuses in May 1969, Mrs. Huffman got up and fed the baby and Mary Marcus stayed in bed until afternoon. On another occasion, Mary Marcus left the two children for approximately 20 to 30 minutes while she attempted to get Tommy Marcus to assist in caring for them. Mary Marcus married her present husband Richard Townsend, in Mexico on February 29, 1970, before the entry of her final decree of divorce, and remarried him in California on August 11, 1970.

The evidence is clear that Andrew, the older son of Mary Marcus, was clean, well-behaved, well-dressed, and

well-fed. Mr. Huffman conceded that was true in June of 1969, at the time he took possession of the children. At the time of trial in the fall of 1970, Andrew was approximately 4½ years old, and still in the custody of his mother. The evidence is undisputed that the apartment of the Townsends in California is adequate and attractive. Mr. Townsend is employed as a truck driver. Mary Marcus Townsend is a long distance telephone operator.

The evidence is also undisputed that the trailer house of the Huffmans is adequate and attractive and that they have provided a good home for Lawrence. Mr. Huffman was a construction inspector for the Bureau of Reclamation in the power transmission division. The evidence does indicate that Mr. Huffman is gone from home approximately 50 percent of the time except on weekends. The neighbors in O'Neill who testified had known the Huffmans for approximately 2 years. The Huffmans were married in 1963. Mrs. Huffman was divorced from a prior husband in 1961 or 1962, and had a daughter who was 10 years old at the time of trial.

Certain related and collateral facts are material and relevant. In the fall of 1969, the Huffmans filed a petition for their appointment as guardian of the person and property of Lawrence Marcus in the county court of Holt County, Nebraska. Decree was entered and appointment was made. Mary Marcus received no notice of the proceedings and none was published. Sometime in 1970, the Huffmans filed a petition for adoption. The grounds for adoption were abandonment. The petition, verified by James D. Huffman, contrary to his testimony in this action, asserted that Lawrence Marcus had been abandoned in the Los Angeles police department, and that Mr. Huffman had acquired him there. No relinquishment was filed from either parent. The adoption proceeding was later dismissed.

It is also noteworthy that Mrs. Huffman, although present in court for 2 days of the hearing, did not testi-

fy nor did Tommy Marcus testify although his actual appearance in court is not reflected by the record.

The district court found that Mary Marcus had not taken a real interest in her child as a natural mother would or should; that she had forfeited her preferential right to the custody of the child; and that she was not a fit and proper custodian for the child. The court thereupon denied the writ of habeas corpus and dismissed the case.

There is no question but that the governing rule is that the custody of a minor child is to be determined by the best interests of the child, with due regard for the superior rights of fit, proper, and suitable parents. Hausman v. Shields, 184 Neb. 88, 165 N. W. 2d 581.

Counsel for the respondents have vigorously asserted that because this is a habeas corpus action, the petitioner has the burden to establish fitness to perform the duties imposed by the parental relationship, even though the petitioner is the parent. They also argue that a parent must establish that the best interests of the child will be better served by the parent than by strangers. We cannot agree.

It is clear from our decisions over a long period of time that courts may not properly deprive a parent of custody of a minor child unless it is affirmatively shown that such parent is unfit to perform the duties imposed by that relationship or has forfeited that right. Ball v. Ball, 180 Neb. 145, 141 N. W. 2d 449; Hausman v. Shields, *supra*.

The respondents argue that the teenage premarital conduct here makes Mary Marcus permanently unfit to have custody of a child. That argument is unsupportable. If such a position were to be adopted by the courts, millions of parents would stand in danger of having their parental rights challenged.

The argument also completely disregards the fact that the California court granted exclusive custody to Mary Marcus, who was continuously a resident of California

and still is. There is no evidence to warrant the upsetting or reversal of that decree. While the decree may not be binding upon a Nebraska court, it is at least entitled to due weight, even if it is not accorded full faith and credit.

The evidence here is wholly insufficient to establish an abandonment of her child by Mary Marcus, nor a forfeiture of her parental rights. She borrowed the money from her mother to make the first trip to Nebraska to reclaim her children less than 3 weeks after the children were first brought to Nebraska. She was arrested and threatened with a charge of kidnapping if she attempted thereafter to take her child. She was unable to retain counsel in O'Neill, Nebraska, and was forced to return to California with only one of her children. She continued in her efforts to regain her other child by telegraph, telephone, and letters and all were unsuccessful. Following her remarriage, with the assistance of her new husband, she was able to retain counsel in Omaha, Nebraska, and commenced this action. She was required to return to Nebraska twice more before she could obtain a hearing upon her petition.

Meanwhile, the Huffmans, who always knew who and where the child's parents were, had completed proceedings for guardianship of the person and property of Lawrence Marcus, without notice to Mary Marcus and without any parental consents or relinquishments from either Mary Marcus or Tommy Marcus. It might be said that Mary Marcus continued the fight to regain the custody of her child against imposing obstacles. To say the least, the evidence flatly contradicts any assertion of abandonment or voluntary forfeiture of her parental rights.

The facts and circumstances here would be wholly insufficient to justify the State of Nebraska in attempting to take the child from the custody of Mary Marcus in a juvenile proceeding. If the State of Nebraska could not remove the custody of her child because of her premarital conduct, certainly a stranger should stand in

no better position. Even if her delivery of the child to Mr. Huffman in June of 1969 were treated as an act of relinquishment performed under circumstances of distress or discouragement, her right to the custody of her child was not lost beyond recall. Barnes v. Morash, 156 Neb. 721, 57 N. W. 2d 783.

The evidence here was simply insufficient to establish that Mary Marcus Townsend was unfit to perform the duties of a parent or that she had forfeited that right.

The judgment of the district court is reversed and the cause remanded with directions to grant the writ of habeas corpus and return the custody of Lawrence Marcus to Mary Marcus Townsend.

REVERSED AND REMANDED WITH DIRECTIONS.

SMITH, J., participating on briefs.

SMITH, J., concurring.

The majority opinion discourages continuing controversies over child custody. I would adapt the Uniform Child Custody Jurisdiction Act generally for judicial use at least on the basis of comity. The adaptation harmonizes with the majority opinion which properly respects the California decree. I concur that Lawrence' needs for a stable environment and a secure family relationship require return to his mother. See, 1968 Handbook of the National Conference of Commissioners on Uniform State Laws, 198 (1968); Bodenheimer, "The Uniform Child Custody Jurisdiction Act; A Legislative Remedy for Children Caught in the Conflict of Laws," 22 Vand. L. Rev. 1207 (1969).

This court has been vigilant to protect property rights of minor children. See, Workman v. Workman, 167 Neb. 857, 95 N. W. 2d 186 (1959), 174 Neb. 471, 118 N. W. 2d 764 (1962). It ought to be no less vigilant respecting their personal rights. I would promulgate this prospective rule: In a custody proceeding, the trial court must appoint counsel for minor children. See, generally, Coyne, "Who Will Speak for the Child?" 383 Ann. Am. Ac. Pol. & Soc. Sc. 34 (1969); Inka and Per-

retta, "A Child's Right to Counsel in Custody Cases," 5 A.B.A. Family L. Q. 108 (1971); Kleinfeld, "The Balance of Power Among Infants, Their Parents and the State," 4 A.B.A. Family L. Q. 320, 409 (1970), 5 A.B.A. Family L. Q. 1, 64 (1971).

BOSLAUGH, J., dissenting.

The trial court found that the petitioner, the natural mother, had forfeited her preferential right to the custody of Lawrence William Marcus and awarded the custody to Mr. and Mrs. James D. Huffman. Mrs. Huffman is the paternal grandmother of Lawrence. The majority opinion holds the evidence insufficient to sustain that finding and awards the custody to the petitioner.

The record in this case leaves much to be desired. This may be due in part to the fact that the petition was filed on September 1, 1970, while the respondents were in Arkansas on vacation. The respondents returned to Nebraska on September 20, 1970. The alias writ was served on Mrs. Huffman on September 23, 1970. The hearing commenced on October 6, 1970.

The petitioner's case consists entirely of her testimony. The respondent's case is largely the testimony of James D. Huffman. His testimony is corroborated in part by testimony of the other witnesses called by the respondents. It is significant that the trial court who saw and heard the testimony of the petitioner found against her.

The petitioner has a history of what might be described as serious instability. She freely admitted that she had lived with her former husband, the father of Lawrence, before they were married, and had married Richard Townsend in Mexico before her divorce was final. She claimed a misunderstanding of the terms of her California divorce, but continued to use the name Marcus long after the marriage in Mexico. As I view the record, the evidence sustains the finding of the trial court.

The record indicates that Lawrence, when first brought to Nebraska, appeared to be nervous and insecure. Dur-

ing the time that he has been with the respondents this condition has gradually improved and he now appears to be well adjusted and a normal child. The result of our decision in this case is to return Lawrence to an environment that is less than satisfactory. I do not agree that this satisfies his need for a stable environment and a secure family relationship.

SPENCER, J., joins in this dissent.

WHITE, C. J., dissenting.

I join fully in the dissent of Judge Boslaugh herein. This is a habeas corpus action between the mother and the paternal grandmother and her husband. The care and custody of Lawrence William Marcus was voluntarily granted by the mother prior to the time of both an interlocutory and final divorce decree in the State of California. Lawrence William Marcus has been in Nebraska and has been cared for in this state for a period of approximately 2½ years since that time.

I feel it is necessary that we keep clearly in mind the precise rules of law that this court has laid down applicable to this situation. It is sometimes difficult to distinguish betwen the rules applicable in a habeas corpus action of this nature and the closely related rules that apply in a divorce proceeding or otherwise found in custody proceedings in this state. These questions were resolved in Reed v. Reed, 152 Neb. 819, 43 N. W. 2d 161. In that case, the mother, in a habeas corpus action against the father and paternal grandparents, urged the finality of a Kansas divorce decree finding her a fit and proper person for the custody of her child and awarding the custody to her. After holding under the facts in that case the divorce decree was not entitled to full faith and credit in a habeas corpus proceeding in this state and the fact alone that the custody of a minor child has been awarded in an action in another state does not prevent inquiry into the question in a proper action by a court subsequently acquiring jurisdiction of the parties in this state, this court stated as follows: "To

give full faith and credit to the decree of the Wyandotte County district court in awarding the custody of the child to its mother in the case before us would be contrary to the laws and public policy of this state where the enforcement thereof is sought. There is a further reason that full faith and credit should not be given the Kansas decree awarding the custody of the child to its mother. The best interests of the child and its future welfare under all circumstances is the vital question in the case and is superior to all other considerations where the question is raised upon a writ of habeas corpus."

In the Reed case, and in numerous cases following and affirming its holding, this court has consistently held that after the court's jurisdiction has been invoked by habeas corpus the child is a ward of the court and its welfare lies in the hands of the court. This power and responsibility is based upon the basic principle that the jurisdiction of a state to regulate the custody of infants found within its territory does not depend upon the domicile of the parents, but has its origin in the protection that is due the incompetent or helpless. The historic jurisdiction of a state to regulate the custody of infants found within its territory does not depend upon the wishes of the parents, or the domicile of the child, but it arises out of the power that every state possesses as parens patriae to every child within its borders to determine its status and the custody that will best meet its needs and wants.

The Reed case has never been overruled and has been followed successively in its various pronouncements with reference to the fundamental jurisdiction and duties of the court in the following cases, the latest of which was in 1971. They are as follows: Copple v. Copple, 186 Neb. 696, 185 N. W. 2d 846; Hausman v. Shields, 184 Neb. 88, 165 N. W. 2d 581; Green v. Green, 178 Neb. 207, 132 N. W. 2d 380; State ex rel. Cochrane v. Blanco, 177 Neb. 149, 128 N. W. 2d 615; Jones v. State, 175 Neb. 711, 123 N. W. 2d 633; Osterholt v. Osterholt, 173 Neb.

683, 114 N. W. 2d 734; Walker v. Gehring, 172 Neb. 398, 109 N. W. 2d 724; State ex rel. Hamilton v. Boiler, 159 Neb. 458, 67 N. W. 2d 426; Lakey v. Gudgel, 158 Neb. 116, 62 N. W. 2d 525; Barnes v. Morash, 156 Neb. 721, 57 N. W. 2d 783; Lung v. Frandsen, 155 Neb. 255, 51 N. W. 2d 623; McNamee v. McNamee, 154 Neb. 212, 47 N. W. 2d 383.

Of course, it is true, that the district court and this court are required to give due regard, as one of the considerations involved, to the natural rights of a mother who is a fit and proper person to have the custody and care of a child of tender years. It is further true, and this court has constantly reaffirmed the proposition, that the custody of a child of tender years cannot be wrenched away from a parent on the basis that somebody else can furnish a better home on a comparative financial basis. Nevertheless, we have adhered consistently to the rule, in a controversy for the custody of an infant of tender years in a habeas corpus proceeding, that the court will consider the interest of the child, and will make such order for its custody as will be best for its welfare, without reference to the mere wishes of the parties. Reed v. Reed, *supra*.

The majority opinion summarily reverses the discretion of the district court in this case, removes Lawrence William Marcus from a secure and loving home environment that he has been raised in for 2½ years since his early infancy, and sends him back to California without the retention of any power to supervise, to control, or to review the needs and the welfare of this small boy. In order to do so, under our decisions, it becomes necessary, and that is implicit in the majority opinion, to hold that the trial judge, who saw and observed the witnesses, and observed their demeanor and conduct in the courtroom, committed an abuse of discretion in retaining jurisdiction of this child for the time being and permitting it to remain with the people who have given it the love, attention, and care of a fine home during the

critical period when no one else was able or willing to do so.

The majority opinion is a persuasive and exhortatory appeal to a basic human emotion, the love and devotion of a mother for a child. However, an examination of the record in this case reveals significant facts directly relating to the welfare and best interest of Lawrence William, which indicate to me the good judgment of the district judge and demonstrate conclusively that he did not abuse his discretion in permitting the child to continue in the fine home with the loving care he is now getting, and retaining the court's jurisdiction to control and supervise the welfare of Lawrence William. Some of these facts are as follows: (1) Mary, the mother, is 20 years of age. What is her record of stability, responsibility, and morality since she reached the age of responsibility? (2) At the age of 16 she had her first child, illegitimate, born out of wedlock. (3) She was expelled from high school for having in her possession a drug. (4) It was necessary for the authorities to place her in a juvenile home not once, but twice; once for possession of drugs and once for running away from her home. (5) She lived with the father of Lawrence William, Tommy Marcus, before they were married and she has lived and resided with Richard Townsend, her present husband, during the period that she was married to Tommy Marcus, and for a long time before the final divorce decree on July 22, 1970. After knowing her present husband for a period of 1 month, she went to Mexico and engaged in a marriage ceremony with him in violation of the provisions of the California interlocutory decree. (6) Her present husband is 28 years of age and has been previously married; his wife was granted the divorce and given the custody of their minor child; he never sees this child; and does not make any child support payments toward the support of his own child. All of this appears from the mother's testimony herself. (7) Her first-born illegitimate child was only

in her possession, care, custody, and control for a period of 6 months during the first 2½ years of the child's life. (8) Lawrence William was born May 11, 1969; he has only been in her possession for a period of about 1 month since he was born. (9) By her own admission, she has attempted to commit suicide and demonstrated to the trial court the marks on her wrists resulting from that experience. (10) The evidence strongly supports the finding that during the period of about 1 month after Lawrence Williams' birth when she had possession of the child, he was not properly and adequately taken care of. She voluntarily relinquished the child to the Huffmans, and the evidence supports the finding that the child had a diaper rash, couldn't keep any food in his stomach, was unstable, was nervous, and was hyperactive. (11) The evidence, including medical, conclusively establishes that Lawrence William is a well-cared for, stable child and has developed into such after being with the Huffmans for the past 2½ years. It shows that from a highly nervous, "fussy," and unstable child, he has developed into a happy, normal child with all of the care, love, and attention of a fine home. There is testimony in the record and before the trial judge that the child's improvement since being with the Huffmans has been "fantastic" and that he is content and is secure. This testimony is corroborated by neighbors and friends of the Huffmans who have had an opportunity to observe the child during the period involved. The doctor's testimony in this case is that a change in environment would disturb Lawrence William. His testimony is to the effect that at the time he first saw the child on August 5, 1970, after the Huffmans brought him to O'Neill, he was hyperactive, nervous, and with excessive motion in his arms and legs. Friends and neighbors testified that since Lawrence has been with the Huffmans, he has become stable, is calm, and it appears to them that he is well-loved, well-nourished, and well-kept; and further that he was clean and

seemed to respond favorably to Mrs. Huffman, his grandmother.

In light of these circumstances, the record in this case falls far short of showing an abuse of discretion by the trial court in making the determination that it did. This is not a case of wrenching a child from a close and normal attachment to its natural mother that has developed over a period of time and granting the custody to some stranger merely because he is able to give it better, more convenient, and more luxurious surroundings. The disposition of the trial court was not on a comparative financial or comfort basis. It was directly related to the well-being and the best interest of Lawrence William, and based upon sound judgment with reference to the future of the child and the precarious nature of propelling it back into an unknown and previously unstable environment with a new "father" who fails to even support his own child. I am firmly of the conviction that considering the primary question before us, and that is the best interests of the child, the mother here has failed to demonstrate, under all of the circumstances, the minimum fitness from the standpoint of the stability of a proper home for a child, from the standpoint of a moral background, the capacity to adequately and physically take care of the child and give it the close attention and care a child of Lawrence Williams' age needs. In reaching these conclusions I am aided by the rule which we have unceasingly followed in this court, one particularly applicable in a child custody case, that a trial judge's discretion should not be interfered with except in rare circumstances in a custody proceeding because the trial judge saw and heard the witnesses, and observed their demeanor and conduct when testifying. His judgment in these circumstances should be given great weight and his discretion should not be overturned unless it appears to this court, on trial de novo, that the disposition was arbitrary,

capricious, unreasonable, and not supported by the evidence.

I am particularly fearful of the disposition and judgment in this case, because they make no recognition of the court's duty to supervise the prospective care of Lawrence William. Lawrence William is a ward of the court and his welfare lies in the hands of the court. Reed v. Reed, *supra*. The testimony of Mary Marcus, the relator, is entirely uncorroborated, furnished the court without even the appearance or the deposition of her present husband, Richard Townsend. No provision is made to retain the district court's power to order an independent investigation of her circumstances and home conditions in California through the welfare authorities, a device used by courts in order to properly exercise their jurisdiction in custody matters.

SPENCER and BOSLAUGH, JJ., join in this dissent.

CLINTON, J., concurring.

The record clearly shows without contradiction that care of Lawrence William Marcus was temporarily entrusted to the Huffmans and some 3 weeks later they unjustifiably and wrongfully refused to return the child to his mother. This refusal was without color of right.

The dissenting opinions pay lip service to the principles regarding the natural rights of the parent but completely disregard them. They imply the state is all-powerful as far as child custody is concerned.

If the dissents correctly state the law then if I should leave my child with a babysitter, the babysitter may if she wishes refuse to return my child to me and I must resort to habeas corpus, and the court may in such action determine the parent's fitness as compared with that of the sitter.

Habeas corpus is not the appropriate vehicle in which to make such a determination. The Huffmans should gain no right through their wrongful refusal. In cases such as this the only issue should be whether the refusal to deliver the child was wrongful.

It is tragic that this case has taken so long to come to a conclusion. This is in some meaure owing to the inability of the mother to procure counsel and legal service when her possession of her child was wrongfully denied her. Counsel who ultimately took the case and fought her battle and that of the child is to be highly commended.

Delay in cases of this kind is intolerable. Disposition of such cases should be given priority by the courts and all concerned.