Nanette Dembitz, J.
In this unusual child adoption proceeding, an unmarried woman now aged 42 petitioned this court to adopt an unrelated baby obtained from Florida, now 13 months old. The agonizing and unprecedented question presented to this court is whether under a proper interpretation of the Domestic Relations Law, Baby H should be removed from the adoption petitioner, and placed through an authorized child-care agency with a husband and wife who are highly desirable parents for her.
Section 116 of the Domestic Relations Law provides that upon a petition for a private-placement adoption (that is, an adoption that has not been screened or approved by a child-care worker or adoption agency), the Judge or Surrogate shall order an investigation, and may require ‘ ‘ further investigations from time to time ”, of the “ marital and family status, and history, of the adoptive parents”; (their) “physical and mental health”; and “facts relating to the familial, social, religious, emotional and financial circumstances of the adoptive parents ’ ’ (subds. 2, 3). Section 116 further provides in subdivision 2: “ Should such investigation give apparent cause, the judge or surrogate shall require the petitioners to show cause why the child should not be removed from the home * * * If the court is satisfied that the welfare of the child requires that it be removed from the home, the judge or surrogate shall by order remove the child from the home of the petitioners and return the child to a natural parent or place the child with an appropriate authorized agency. ’ ’ In the case at bar the natural mother definitely does not want this out-of-wedlock child returned to her and has not divulged the putative father’s name. Accordingly, if the welfare of the child requires her removal from petitioner, she would necessarily be placed with an authorized agency.
The Florida mother’s affidavit of consent to her child’s adoption, which was filed with petitioner’s adoption petition (see Domestic Relations Law, § 115, subd. 7), was a consent to an adoption by a married couple to be designated by the Florida attorney who obtained the affidavit. This document obviously did not authorize petitioner’s adoption of Baby H, nor has a valid consent to her adoption by anyone been obtained from the natural mother.[1] However, whether or not the child is ever adopted, since her natural mother does not want her, either petitioner or the husband and wife with whom she would be placed *306 through an authorized agency will have a life-long parental relationship to her. Thus the issue herein is in essence the establishment of a permanent family for Baby H, and precedents as to a child’s welfare in permanent custody or adoption are therefore pertinent. On the basis of these precedents this court determines, despite great sympathy for petitioner’s emotional and financial loss, that under the mandate of section 116 of the Domestic Relations Law to remove the child if required by the child’s welfare — as distinguished from the petitioner’s — removal and placement with an authorized agency for permanent parental care by an available and desirable husband and wife must be ordered.
PROCEDURE UNDER SECTION 116 OF THE DOMESTIC RELATIONS LAW
Research has disclosed no prior use of the removal provision of section 116, except to return a child to his natural mother,[2] nor has this Judge in scores of previous private-placement adoptions encountered any occasion to apply it. Here, however the initial report of the court’s adoption investigator gave “ apparent cause ” to consider removal in that it showed, among other adverse factors, that the middle-aged petitioner lived with an elderly mother in a cramped apartment in a deteriorated hotel; that petitioner, who has no independent resources, worked full time in a 9 a.m. to 5 p.m. office job; that her mother, for physical or emotional reasons that petitioner was unable or unwilling to articulate, did not take care of the baby while petitioner worked; that petitioner used babysitters whom she did not trust to take the baby outside the apartment; and that her account of her married life before her divorce of four years before was puzzling.
The court therefore directed “further investigations” by means of home visits to petitioner by the court’s adoption investigator, a psychiatric examination of petitioner, and a psychological study of the child. Petitioner’s attorney agreed to the court’s use of the psychiatric and psychological reports, all reports being disclosed to him. As to the fairness of this procedure see Kesseler v. Kesseler (10 N Y 2d 445); People ex rel. Fields v. Kaufman (9 A D 2d 375, 378 [1st Dept]). In addition to the reports, upon notice to the natural mother as required by section 116[3] and appropriate notice to petitioner’s attorney, prolonged *307 hearings were held pursuant to section 116 for her ‘ ‘ to show cause why the child should not be removed from the home.” There is no controversion or doubt as to any significant fact; the only questions herein are of law.
THE COURT’S FUNCTION IN ADOPTION PROCEEDINGS
Petitioner’s attorney suggested that this court disqualify itself from conducting the show-cause hearing because of its preconception adverse to petitioner; he also objected to the court’s communication on its own motion with the natural mother as to her consent to her baby’s adoption and as to her rights and options in view of her expressed opposition to a single-parent adoption. These objections must be rejected. The procedure prescribed by section 116 for the Judge to hold a hearing to resolve doubts arising from an investigative report on an adoption petitioner, is fair and constitutional. (See Friedman v. State of New York, 24 N Y 2d 528, 541-542; also People v. Horton, 18 N Y 2d 355, 361-362; Federal Trade Comm. v. Cinderella Career Schools, 404 F. 2d 1308, 1315 [C. A., D. C. 1968].) And it is clear that under subdivision 3 of section 115, subdivision 7 of section 115 and subdivision 2 of section 116 the court has the duty of examining into the meaning and validity of an alleged consent, and of acting on its own motion as in effect guardian of the child’s interests.
The legislative grant of such broad authority and discretion to the court has two-fold justification: (1) Adoption proceedings differ from ordinary civil cases in that except for the very small minority of contests of adoption by a natural parent or other relative, there is only one party- — the petitioner — before the court; there is no adversary to present opposing evidence or arguments either to prevent fraud or mistake or to protect the welfare of the inarticulate child. (2) Usually a private-placement adoption, as in the case at bar, is entirely arranged by attorneys for the adoption petitioner and no one has the duty or function of considering, prior to the child’s placement and the filing of the adoption petition, whether the adoption is t-o the child’s interest as distinguished from the petitioner’s. Thus, with no one representing the child’s interest or welfare, the exercise of the State’s power as parens patries as provided in section 116 is not only reasonable but obligatory.[4]
*308 Petitioner’s objection is in reality to the fact that the Legislature does not countenance a catch-as-catch can, free enterprise market in babies. Private-placement adoption petitions are nevertheless generally granted without difficulty by this court, because petitioners usually- — due either to their or their attorneys’ discretion and self-restraint — • approximate the standards accepted for adoptive parents by the community, child welfare experts, and authorized adoption agencies.[5] The case at bar shows, in this court’s opinion, an unfortunate lack of the self-policing on which private placements for adoption must be premised; it does not exemplify an individualized private-placement by “ a lawyer who knows a couple who would make good parents and merely wants to help.”[6]
ADOPTION COMMITTEE REPORTS
The attorney’s duty to warn his client at the outset that the courts do not rubber-stamp adoption petitions (see Bilmes, Report on Adoption Law, 40 N. Y. St. Bar J., 1968, pp. 236, 241, 365) was particularly great in the case at bar; petitioner’s hold on the baby was blatantly precarious from the beginning, because the natural mother had consented to an adoption by a couple, rather than a single parent. (Judging from the fact that the Florida attorney who obtained Baby H from her natural mother and/or his relative brought the baby to New York — a method of transferring a baby which the court knows from its adoption experience to be unique — it may be that petitioner was so warned.)
INTERPRETATION OP CHILD WELEARE STANDARD OE SECTION 116
In determining ‘1 what the welfare of the child requires” within the intent of section 116, it is clear that an adoption petitioner like the one at bar lacks ‘ ‘ the status of a natural parent ’ ’ whose custody, by reason of her biological relationship, is presumptively beneficial to the child. (See People ex rel. Scarpetta v. Spence-Chapin Adoption Serv., 28 N Y 2d 185, 192; also Matter of Spence-Chapin Adoption Serv. v. Polk, 37 A D 2d 718, 719 *309 [2d Dept.], affd. 29 N Y 2d 196.) Nor indeed has petitioner any claim to the child similar to a natural parent’s. A child’s life is not subject to bargain and purchase; there is no chain of title or contractual right to a child even if — contrary to the instant facts — a valid consent to adoption is obtained. (See Scarpetta, supra, p. 191; Matter of Anonymous, 286 App. Div. 161, 165 [2d Dept.].)
Nevertheless, in New York which has preserved private-placement adoptions despite their abolition or limitation in some States,[7] the courts could not be intended to jettison all such adoptions by the removal of children from petitioners’ homes merely on the basis of minor disadvantages compared to other available homes. Further, in the sensitive area of family relationships and child development, a Judge is under a special compulsion to examine his conclusions over and over from all vantage points to make sure that he eschews individual bias or idiosyncratic standards. (Cf. Posusta v. United States, 285 F. 2d 533, 535 [C. A. 2, 1961]; United States v. Francioso, 164 F. 2d 163 [C. A. 2, 1947]; also Roth v. United States, 354 U. S. 476, 490.)
Accordingly, a child can be removed under section 116, in this court’s opinion, only if the adoptive home is clearly and drastically below commonly accepted standards for adoptive placement; if the child’s development into normally adjusted adulthood appears, in the light of generally agreed wisdom as to the welfare of children, seriously endangered; and if there is available parenting for the child which meets those standards and erases that specter of danger.
INDICATIONS 03? LEGISLATIVE INTENT
It is clear that a positive judicial concern for the child’s welfare is to be exerted under section 116 rather than, as has been suggested herein, the minimal and in effect negative approach that the Family Court Act prescribes for child-neglect proceedings against a natural parent. The court’s duty in the latter cases to insure only the ‘ ‘ minimum degree of care ’ ’ tolerable in a humanitarian communityr (Family Ct. Act, § 1012, subd. [f], par. [i]), is based on the philosophy of the least possible interference with the biological family,[8] whereas under section *310 116 the issue is whether the State should affirmatively permit and approve the establishment by a nonparent of a permanent in loco parentis relationship. And it is clear from the thorough nature of the investigation prescribed by section 116 that the court is intended to evaluate on a deep rather than a superficial level, whether the child is securing parental roots that promise his life-long welfare.
Not only is the minimum neglect standard therefore inappropriate, but it must be assumed that the Legislature would have incorporated it by reference to the Family Court Act and its predecessor acts if it had intended the courts to apply it under section 116 of the Domestic Relations Law. (See Rankin v. Shanker, 23 N Y 2d 111, 115.) Further, the deletion by the 1962 amendment to section 116 of the prior reference therein to disposition of [11] a child without proper guardianship ” (see L. 1962, ch. 690, § 3) indicates the legislative intention for the court to employ a standard higher than minimum care. (See French v. Banco Nacional de Cuba, 23 N Y 2d 46, 61.)
Finally, subdivision 2 of section 116 must be construed in harmony with subdivision 4 thereof providing that the court is to grant an order of adoption only if “ satisfied that the moral and temporal interests of the child will be promoted ” thereby. If a court had to deny an adoption because it did not promote the child’s interests but nevertheless lacked power to remove the child from the adoption petitioner, the result would harm rather than benefit the child. For, the child would be deprived of the legal status of an adoptee[9] without the benefit of removal to a home that would serve his interests.
Thus, from the standpoint of consistent and reasonable legislative policy[10] and of the State’s obligation as parens patries, subdivision 2 of section 116 cannot be interpreted as incorporating the minimal parental neglect standard, but must be interpreted as a direction to the court to remove a child from a private-placement adoption petitioner’s home unless remaining there promotes the child’s interests.
*311 EQUAL PROTECTION OF THE LAW
The removal provision of section 116 arguably poses a question under the constitutional guarantee of equal protection of law, in that it gives the courts a power with respect to an adoption petitioner that they do not exercise over an individual housing another person’s child without filing an adoption petition.[11] However, it is constitutional for the State to regulate one aspect of an evil and not another, if there is any reasonable ground for distinguishing them. (See Seagram & Sons v. Hostetter, 384 U. S. 35, 50-51; Morey v. Doud, 354 U. S. 457, 462; Rankin v. Shanker, 23 N Y 2d 111, 119.) Here the distinction is that generally in the nonadoptive situation the person to whom a natural mother entrusts her child is, of necessity, someone she knows, with whom she may maintain contact and from whom she may retake the child. On the other hand, in the case at bar and in most private-placement adoptions, the natural parent does not know the identity of the adoptive parent, at best receiving only a general description by the adopter’s attorney[12]; and contact with the natural parent is permanently terminated.
In view of these significant differences, section 116 is based on a reasonable classification and is not a denial of equal protection to petitioner and others similarly situated (or to the children involved).
BABY H’s WELFARE IN RELATION TO PETITIONER
Besides other disadvantages of petitioner as a parent for Baby H, the salient feature of the case at bar is that though Baby H is a highly adoptable child of 13 months for whom parental care by desirable young couples is available, petitioner is an unmarried woman of 42.
Adoption by a single person has generally and in this court’s experience been sought and approved only in exceptional circumstances, and in particular for the hard-to-place child for whom no desirable parental couple is available. In the universal *312 view of both experts and laymen[13], while one parent may be better than none for the hard-to-place child, joint responsibility by a father and mother contributes to the child’s physical, financial and psychic security as well as his emotional growth. This view is more than a matter of present convention, anthropologists pointing out that the institution of marriage, which is a method of signifying commitment to such joint responsibility, evolved in response to the need for two-parent care of children.[14]
Because petitioner is already middle-aged[15], she mentioned the possibility of a younger married cousin undertaking the child’s care if she died or became disabled before the child was old enough to care for herself; however, no such undertaking has been made (even assuming that such an expression of willingness to take over the child from petitioner would insure-material or emotional security). Further, while financial circumstances generally have little bearing on the desirability of an adoption (or permanent custody), in this single-parent situation petitioner’s comparatively modest means, without any relative to help her, may well affect the calibre and constancy of babysitters she can secure to take care of the baby while she perforce works.[16]
Further, the courts have stressed the problem of the sense of identity of an adopted child (a problem which a fortiori concerns a nonadopted but permanent foster-child). (Matter of Spence-Chapin Adoption Serv. v. Polk, 37 A D 2d 718, 720 [2d Dept.], affd. 29 N Y 2d 196; People ex rel. Anonymous v. Louise Wise Serv., 21 A D 2d 327, 329 [1st Dept.].) In the case at bar self-doubt and a sense of deprivation might well be compounded by the child’s view that she was not only rejected by her natural *313 parents but that she was not even worthy of care in a normal family. Petitioner does not live in a communal, “woman’s liberationist ” or otherwise unconventional milieu; thus there is here no issue of whether she would supply the child with a strengthening self-image and sense of values in substitution for the conventional one that a child’s acceptance by both a father and a mother is an asset. The question is not the tolerability of households headed by one natural parent, which obviously are prevalent, but rather whether the welfare of Baby H is served by the imposition on her of the one-headed home of a nonparent.
Contradicting her testimony of six weeks ago, as well as her statements that she thought it was an advantage to Baby H to have only one parent, petitioner now says that she is planning to marry. If in truth there is such a possibility, the court cannot believe that a hastily-contrived marriage — obviously arranged for the purpose of this litigation — would either endure or be beneficial for Baby H. Petitioner’s attitudes towards the child and her unrealistic, misguided, or uncandid testimony about her past and possible future marriage, while perhaps insufficient basis in themselves for the child’s removal, did not indicate strengths that should be weighed in the balance against petitioner’s obvious deficiencies as Baby H’s parent.[17]
On the whole case, the court cannot escape or dismiss the opinion that there is grave danger, if the child remains in petitioner’s custody, of her becoming a resentful, alienated runaway or delinquent adolescent, such as this court sees in tragic number. The evidence as to petitioner is far from establishing the [11] special circumstances which justify as an exceptional measure the making of an adoption order ” for a single-person petitioner[18] or, by the same token, the approval of a single nonparent’s permanent in loco parentis status.
It is true that Baby H has had a normal development to date, but this court knows from its experience that children who are highly disturbed, maladjusted and delinquent in their pre-teens and teens for the most part are healthy, normal babies when only a year old. And it is petitioner’s “ lifetime assignment ” to the parental role for Baby H that the court must consider. (See Matter of Spence-Chapin v. Polk, 29 N Y 2d 196, 204.)
*314 PLACEMENT WITH “ APPROPRIATE AUTHORIZED AGENCY ” UNDER SECTION 116.
In contrast to petitioner, Mr. and Mrs. M, who have been approved by an authorized agency as an adoptive couple and who are highly desirous of giving permanent parental care to Baby H (whether or not they can ever adopt her), have been married seven years, and have been unable physiologically to have a child. The wife, aged 30, is a kindergarten teacher of underprivileged children; she will immediately forego her work in order to take care of Baby H. She and her husband, aged 33, a member of a cotton brokerage firm with an annual income of over $20,000, live in a suburban home.
According to a careful and detailed agency study, the personalities of the M’s are excellently suited for parenthood (the agency reports, with the names of the couple deleted, are incorporated in the record in this case).[19] While it is true that the child would have to make an adjustment to removal from petitioner, recent studies of adoption[20] show that children much older than Baby H adjust successfully to a favorable — though new — 'environment (and this Judge has observed such adjustments).
Thus, according to generally accepted views on child-development, the benefit to Baby H of removal from petitioner is clear, unequivocal and major. It may be noted that the guardian ad litem for the child — an attorney of broad experience and mature judgment — agrees with this conclusion. With sympathy for petitioner’s misguided misfortune but with adherence to the court’s obligation to promote the welfare of speechless, helpless Baby H[21], the court directs her removal from petitioner’s home and placement with the Spence-Ohapin Adoption Service for permanent custody by Mr. and Mrs. M.

. A summary of the efforts to clarify the natural mother’s consent is set forth in an appendix to this opinion. (Appendix omitted as unnecessary to an understanding of the opinion.)

. See Matter of Anonymous (32 Misc 2d 683 [Surrogate’s Ct., Westchester County]; Matter of Anonymous (45 Misc 2d 814 [Surrogate’s Ct., Westchester County]).

. The regrettable passage of four months since the commencement of this proceeding was largely due to the court’s effort to give the natural mother an opportunity to appear at the hearing and her initial expressed intent to reclaim the child.

. See Finlay v. Finlay (240 N. Y. 429, 433-434); Agur v. Agur (32 A D 2d 16, 19-22 [2d Dept.]); also State of West Virginia v. Pfizer & Co. (440 F. 2d 1079, 1089 [C. A. 2, 1971]); Georgia v. Pennsylvania R. R. Co. (324 U. S. 439, 443).

. See Witmer et al., Independent Adoptions (Russell Sage Foundations, 1963, p. 50); Gellhorn, Children and Families in Courts of New York City (1954, pp. 248-250).

. Note, Natural v. Adoptive Parents, 57 Iowa L. Rev. (1971), 171, 185. See, also, Grove, Independent Adoption: The Case for the Gray Market, 13 Villanova L. Rev. (1967) 116, 121; O’Connell, Adoption Muddle, 15 N. Y. Law Forum (1969) 759, 764r-765; Embiek, The “In Blank” Consent and the Independent Adoption, 5 Willamette L. J. (1968) 50, 59-60; Beral, The 'Case for Agency Adoptions, 41 Los Angeles Bar Bull. (1966) 452.

. See Grove, Independent Adoption: The Case for the Gray Market, 13 Villanova L. Rev. (1967) 116,130; Sampson v. Holton, 185 N. W. 2d 216, 219 (Iowa, 1971).

. See Katz, When Parents Fail (1971) pp. 6-9, ch. 3; Matter of Vulon, 56 Misc 2d 19, 24 (Family Ct., Bronx County).

. See as to its benefit, Domestic Relations Law, § 117; People ex rel. Hydock v. Greenberg, 273 App. Div. 710, 711-12 (1st Dept.).

. A phrase must be interpreted by “ looking to the enactment as a whole, by discerning the purpose and policy underlying the statute r * * as an integrated phrase in a statutory scheme.” (MV AIC v. Eisenberg, 18 N Y 2d 1, 3-4. See, also, Railway Mail Assn. v. Corsi, 293 N. Y. 315, 321-322; Town of Putnam Valley v. Slutzky, 283 N. Y. 334, 343; Downing v. Downing, 32 A D 2d 350, 351 [1st Dept.] (“ Statutes should be read to make sense.”)

. Authority in the latter situation has been established by some domestic and foreign States. See Grove, op. cit., supra, n. 6, p. 130; British Assn. of ChildCare Officers, Adoption (1969) 26-27.

. See e.g., Matter of Anonymous, 178 Misc. 142, 143, 146 (Surrogate’s Ct., Westchester County); Sampson v. Holton, 185 N.W. 2d 216, 219 (Iowa, 1971); Beral, loe. eit., supra; Embiek, op. cit., supra, n. 6, pp. 52-56.

. E.g., N. Y. St. Assembly Comm, on Social Services, Report on Adoption Practices (1970), p. 8; Child Welfare League of America, Standards for Adoption Services (1968) § 5.19; Gallagher, Adoption Resources for Black Children, 18 Children (1971) 49; Branham, One-Parent Adoptions, 17 Children (1970) 103; British Assoc, of Child Care Officers, Adoption (1969) 51; Armstrong, One Parent is Better Than None, Good Housekeeping Magazine for Jan. 1967, p. 69; Mangel, An Unmarried Mother for Mike, Look Magazine for Feb. 4, 1969, 57; Keiffer, Woman Alone, Good Housekeeping for July 1970, 85.

. See Katz, When Parents Fail (1971), pp. 1-4; Palley, The Adoption Act of 1967, 21 Northern Ireland Legal Q. (1970), 304, 305-306; Malinowski, Family, in Encyclopedia Britannica.

. The “ attained age ” of an infant’s custodians is important when they are “ evaluated for life-time assignment in prospective adoption.” (Matter of SpenceChapin v. Polk, 29 N Y 2d 196, 204).

. One of the few clear correlates with unfavorable outcome for adoptees is the habitual use of baby sitters before the age of 10. Jaffee and Fanshel, How They Fared in Adoption (1970), pp. 282-283.

. While petitioner’s living quarters have improved since the first investigative report (although perhaps only temporarily for the purpose of impressing the investigator), the other adverse factors then revealed, including inadequate substitute care for Baby H while petitioner works, have shown no improvement.

. See Matter of R.M. (an Infant) (1941) Week. N. 244 (C.A.) (England). Research has revealed no American decision on the desirability of a single-person adoption except by a natural father. See, e.g., Lavell v. Adoption Institute, 185 Cal. App. 2d 557 (1960).

. The M’s are Protestant as was the natural mother. Regardless of the validity of a document showing Baby H’s “ induction into the Jewish religion ” while in petitioner’s home, the Jewish agency (Louise Wise Services) refused to recommend a desirable couple as permanent custodians for Baby H.

. Jaffee and Fanshel, How They Fared in Adoption (1970) 307 ft.; Kadushin, Adopting Older Children (1970) passim.

. As declared in a much-cited decision: “ The problem of determining who shall have custody of a child may be presented to the courts in a variety of situations * * * The decisive consideration in each instance is the welfare of the child.” (People ex rel. Grament v. Free Synagogue Child Adoption Committee, 194 Misc. 332, 337 [Sup. Ct., N. Y. County]). Even in a proceeding against a natural mother to terminate permanently her claim to her child, the child’s welfare rather than the mother’s deprivation is paramount. (See Matter of Klug, 32 A D 2d 915 [1st Dept.].)