STATE, EX REL. PAUL BIZE, GUARDIAN, APPELLEE, V. GLEN
B. YOUNG ET AL., APPELLANTS.

FILED JULY 17, 1931.   No. 27791.

*Ernest F. Armstrong* and *F. P. Marconnit,* for appellants.

*Robert M. Armstrong, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY, DAY and PAINE, JJ.

EBERLY, J.

This is a habeas corpus proceeding; a controversy over the custody of a child, now ten years old, named Valentine Grivel. The relator prevailed, and respondents appeal.

The fair inference from the record before us is, that her parents, Joseph Grivel and Judith Grivel, migrated from France to America and settled in Nemaha county; that French thereafter continued to be the language of the home. They there acquired a 66-acre farm, and at the time of the father's death had accumulated, in addition to the farm, more than $5,000 in personal property. To Joseph Grivel and Judith Grivel were born four children: Martin, Henry, Joseph, Jr., and Valentine, who were respectively, at the inception of the litigation out of which the present controversy arose, 16, 15, 9 and 8 years of age. Glen B. Young was the banker and family adviser of both the father and mother, and apparently possessed their confidence and esteem. The sole relation by blood this family possessed in America was Mrs. Marie Anville, an aunt or cousin of the minors. The father died and Judith Grivel on January 12, 1928, filed a petition in the county court for Nemaha county for her own appointment as guardian for her minor children. She was duly appointed and served until her death on February 3, 1929. Thereafter on February 5, 1929, Martin and Henry Grivel, then aged 16 and 15 years respectively, caused to be filed a petition setting forth the death of their mother and the facts establishing the necessity of the appointment of a successor to Judith Grivel, deceased, as guardian, and nominated Glen B. Young for appointment as their guardian, and

likewise prayed for his appointment as guardian for their minor brother Joseph, aged 9, and their sister Valentine, then aged 8. *Seward v. Didier,* 16 Neb. 58. No objections or answer were filed thereto. Due notice appears to have been given of this proceeding, and the county court for Nemaha county, by a decree dated February 7, 1929, found: "Since the commencement of this hearing there has been filed in this court a petition for probate of the will of the mother of said minors, and for the appointment of Glen B. Young as administrator with the will annexed, and it is within the knowledge of the court that the mother of said minors, now deceased, was their guardian, and it will be necessary for the administrator to make settlement with the guardian, and that a conflict of interest might arise if Glen B. Young were appointed guardian of said minors. The court further finds that it is not for the best interest of said minors that Glen B. Young be appointed their guardian." Their nomination of, and prayer for the appointment of, Glen B. Young was accordingly disapproved and denied; and one Jules Bernard was thereupon appointed as guardian for all of the four children. However, Jules Bernard refused to accept the appointment thus made and failed to qualify. On March 2, 1929, the county court, so far as disclosed by the record before us, without further notice or any consultation or communication with the minors involved, and without any order of continuance, or order setting the time for hearing of the matter, appointed Paul Bize as their guardian, who thereupon on March 4, 1929, qualified by taking the oath and giving bond as required by law. On March 15, 1929, all of the minors involved, by their next friend and next of kin, Marie Anville, gave notice of and perfected an appeal from the order of March 2, 1929, making the appointment of Paul Bize as guardian. On April 24, 1929, this appeal proceeding was dismissed on behalf of the parties taking same. On May 3, 1929, Martin Grivel, aged 16, Henry Grivel, aged 15, and Marie Anville, an aunt or cousin of the minors, and "the only blood relative of all of said minors living in the United States," filed their

petition in the county court for Nemaha county for the removal of Paul Bize as guardian, and the appointment of Jules Bernard in place thereof. This pleading alleged, among other things: That the minors and next of kin involved had no knowledge or notice of the failure of Jules Bernard to qualify as guardian under the appointment made February 7, 1929, nor of the hearing had on March 2, 1929, at which time Bize was appointed, nor did they have any knowledge of the county court's intention to appoint Paul Bize as guardian; that his appointment is not agreeable to them; that the parents of said minors, who died within the last two years, lived in the same community with the said Paul Bize for many years, and did not have a favorable acquaintanceship with him, and that the minors likewise did not have a favorable acquaintance with him; that said minors and said Marie Anville have not in the past had any dealings with Paul Bize and prefer a guardian with whom they are acquainted, and that all of said minors refuse to be controlled or live with the said Paul Bize, and if compelled to submit to personal direction with reference to their person, it will be against their will; that Jules Bernard (who had theretofore, without suggestion from the minors, been appointed by the court, but who had once refused the appointment) was a competent and suitable person to act as guardian, and had now consented to act if appointed by the court; and prayed for the removal of Paul Bize. (It is to be remembered, in this connection, that "Jules" is the French form of the name "Julius.") To this petition, answer was filed by Bize, and, on hearing of the issues thus joined, the county court found for the defendant and against all of the minors, and failed to remove its appointee, denying the prayer of the petition wholly. An appeal was prosecuted from this judgment to the district court for Nemaha county. It was there heard on June 26, 1930, taken under advisement, and later determined and judgment entered on July 1, 1930, reversing the order of the county judge appointing Paul Bize as guardian for Martin Grivel and Henry Grivel, but affirming it as to Joseph, Jr., and Valentine, the findings

of the district court as to Joseph and Valentine being limited to the following: "The court finds that the county court had jurisdiction to appoint Paul Bize guardian of Joseph Grivel and Valentine Grivel, minors under the age of fourteen years, and no cause has been shown why Paul Bize should be removed as their guardian."

During the proceedings herein referred to, a petition for the unconditional adoption of Valentine Grivel by the Youngs was forwarded to Paul Bize for his consent as guardian. This he refused absolutely, and this without reason or justification in the record. Thereupon this habeas corpus proceeding was instituted, the determination of which by the district court is now presented by the respondents for review.

The proof in the record presented to the district court on this issue is practically without material conflict, and essentially undisputed, so far as evidential facts are concerned. It may be said to be solely a question of the ascertainment and proper application of the law to admitted facts.

We, therefore, accept the appellee's brief as summarizing the testimony in behalf of the relator, which (in addition to the record evidence as to court proceedings) states it in the following language: "Mr. Bize testified that he had talked the matter over with his wife and was ready and willing to take the little girl into their home; that if he obtained her custody he would keep her for quite a while if it was agreeable to both parties; if not, that he would find a better place for her with the consent of the county court, and that he was ready, willing and able to give his ward all of the advantages of a home and of an education. Mrs. Bize, wife of the relator, testified that she was ready and willing to take this little girl into their home and to give her a home at all times; that the child should have every advantage that an own child should have in a home and that she would be treated as an own child and given every advantage that they could, including not only a high school education, but a college education. The guardian and his wife are substantial citizens of Nemaha

county, residing upon and owning 480 acres of farm land south of Julian on a paved highway, with a new modern home near a modern consolidated school of twelve grades, and are amply able to give their ward every advantage of a wholesome and christian home life with ample means to provide for all the wants of any girl, including support, care and higher education."

For a more complete understanding of the résumé quoted, we quote the following from the direct examination of Paul Bize:

"Q. Mr. Bize, after the court appointed you as guardian for this little girl, did you have any plans or intentions with reference to the custody and care for the child? A. I said that I wanted to have her in my home for a while. Q. For what reason? A. Why, so that we would get better acquainted together. Q. Did you talk with Mrs. Bize about this matter? A. I did. Q. Tell the court whether or not it was agreeable to her to take this little girl into the home? A. She said it would be agreeable to her. Q. Upon obtaining the custody of the little girl, what is your present intention, your plan as her guardian with reference to her care and education and her rearing? A. Well, if it was agreeable to both parties, her and us, I will keep her quite a while; if not, I would find a better place, with the consent of the county court, why I would put her some place else. Q. That is, when you say, if it was agreeable to both parties, you mean that if the relations between you and your wife and the little girl were agreeable? A. Yes. Q. What were your plans with reference to where she would attend school? A. At Julian. Q. State whether or not you are ready and willing and able to give her all of the advantages of an education and medical care? A. I am."

And from his cross-examination the following:

"Q. Now, did you and the father and mother of Valentine visit back and forth as a rule between your families before the death of themselves? A. No; we didn't go to each other's house, if that is what you mean. * * * Q. Now, have you ever been informed by Mr. and Mrs. Young

that they were willing to adopt Valentine as their lawful child? A. There was a petition sent to me; yes. Q. And that was for the unqualified adoption, is that not true? A. Yes; I think so; yes. Q. Now, you stated on your direct examination that you wanted to take this child from its present home and take it to your home for a while? A. Yes. Q. Now, you state that is for the purpose of getting better acquainted with the child, is that true? A. Yes; that is one. Q. Would you be willing to adopt this child yourself? A. No; I don't know that I would; I don't know; it is according to circumstances I think, after this. * * * Q. That would depend on many things, is that right? A. Well, yes. Q. At this time you have no—have not made up your mind whether you would or not? A. No; I have not."

And, further, we quote from the cross-examination of Mrs. Paul Bize, the following:

"Q. Did you neighbor with Mrs. Grivel when she lived, Mrs. Bize? A. Ever? Q. Did you ever? A. I did not neighbor with Mrs. Grivel; she couldn't talk our language. Q. Now, do you speak French? A. No, sir; I do not. Q. They lived near by you folks, didn't they, a mile or so, or two? A. Two miles and a half they really lived. Q. About a mile and a half, wasn't it? A. Two miles and a half."

The following constitutes a résumé of the important evidence introduced at the trial on behalf of the respondents; substantially as shown by the record:

Mrs. Glen B. Young, respondent, testified that she was thirty-three years of age; that she was the wife of Glen B. Young, the other respondent; that she had lived with her husband in Lincoln, Nebraska, since June, 1930; prior to then living with him at Julian; that they had the custody of Valentine Grivel since her mother's death in February, 1929; that she had been acquainted with the parents of Valentine Grivel; that her husband had business relations with Mrs. Grivel; that Valentine was at Mrs. Anville's, a cousin of Mrs. Grivel, at the time of the latter's death, when she first received custody of the little girl; that Mrs. Anville was the only living relative of Mrs.

Grivel in this country; that she made an agreement with Mrs. Anville, with the consent of her husband, to take the custody of Valentine; that they took her into their home; sent her to school; that she appears contented and satisfied; that she has been there since her mother's death; that the respondents have given her considerable medical attention; that her tonsils were removed; her teeth given attention; that she has been fitted with glasses; that the respondents have supplied Valentine with considerable clothing, toys, and playthings; that the money for these things has been furnished by the respondents; that no demand has been made to the relator for their payment. Mrs. Young further stated that the relator had never been to visit the child, nor had he ever inquired about her welfare; that the child has been kept in school; that she does well in her studies; that Valentine is given special instructions in dramatic art each week; that the respondents live in a modern apartment; that they are financially able to take care of Valentine; that she makes constant inquiries from Valentine's teachers as to her welfare; that the respondents have no children of their own; that they desire to adopt this little girl; that since they have had custody of the child she has been brought under no vicious or immoral influence; that they intend to give the child the best education possible; that the father and mother of respondent's husband have shown great affection for Valentine, and have given her clothing and toys; that the little girl calls them grandfather and grandmother.

On cross-examination Mrs. Young testified that her husband was cashier of the Bank of Julian until it closed; that he then operated a teachers' agency, and is now in connection with banking business again; that he has a monthly income of about $175. Mrs. Young stated that she had been married since 1917; that neither she nor her husband had been married before; that they have a pleasant congenial home relationship; that they have never had domestic troubles; that they are not related to Valentine Grivel; that she took the child into her home to love her and give her a home, and that she wanted to keep her, and

that is why she did not want to turn her custody over to the legal guardian; that she often takes Valentine to visit her brothers, Martin, Henry, and Joseph; that she has Valentine write them each week, and encourages her to love and be proud of them; and that, although the relator was guardian of one of Valentine's brothers, he had not taken him into his home.

Mina H. Hoemans testified that she lives in Lincoln, Nebraska; that she knew the respondents and the little Grivel girl; that she frequently visited in the Young home; that she had observed that Valentine was always well dressed; that the Youngs showed an affectionate attitude toward her, and that the child appeared to love them; that in her opinion the respondents were suitable persons to have the care of the child.

Mrs. Blanche Frantz testified that she lived in Lincoln, Nebraska; that she had known the Youngs for about twenty years; has often visited in their home; has observed the attitude of the respondents and the little girl; that it was one of happiness and devotion between them; that the respondents were proper people for the custodians of the child; and that she is not related to the respondents.

Edith Miller testified that she had formerly taught school at Julian; had taught Valentine Grivel; had lived at the home of the respondents during the time Valentine was with them; that Valentine was kept in school regularly; that the respondents took an interest in her work, and kept a close watch over her welfare; that Valentine was an apt pupil; that she was an easily managed little girl; and that the home influence provided by the respondents was excellent; and that Valentine would accompany the respondents when they went places. Miss Miller stated on cross-examination that Valentine was a bright student when she lived with her parents, and then gave testimony that, upon the death of the child's mother, friends and neighbors gave the little girl articles of clothing.

Mrs. Ellen Welch stated that she lived at Julian, had known the respondents for about ten years; that she had the custody of Martin Grivel, Valentine's brother; that the

Youngs often bring Valentine to see Martin; that the atti-
tude between the respondents and the little child is very
loving; that they never have any trouble with her, and
that Valentine is in good physical condition; that the
Youngs are proper persons to have the custody of this
child. Mrs. Welch testified on cross-examination that she
had had both business and social relations with the re-
spondents; that the Youngs had no domestic troubles; and
that Mr. Young's reputation for morality was good.

Mrs. I. M. Maag testified that her daughter had her ton-
sils removed at the same time the respondents had Valen-
tine's tonsils removed, and that Mrs. Young gave the child
a fine motherly care and attention.

Mrs. Dale Lyons testified that she had lived near Julian
for about twenty years; that she knows the respondents
and Valentine Grivel; that she has visited in their home;
and the attitude between the respondents and the child is
excellent; that the child is dressed well; and that she
seems happy and enjoys her home.

Mrs. Leona Christie testified that she had been a neigh-
bor of the respondents when they lived in Julian; that the
Youngs gave a great deal of care and attention to the lit-
tle girl; kept her in school; that the child seemed happy
in the respondents' home; that the witness has a small
daughter that was a playmate of Valentine's; that the
Youngs took Valentine with them when they went places;
and that Mr. Young was very fond of Valentine and her
playmates; and that he would play games with them.

Elizabeth Strange testified that she lived in Julian;
knew the respondents and the little Grivel girl; that she
was their neighbor and frequently visited in their home;
that there was a very affectionate attitude between the
child and the Youngs; that the respondents did not leave
home without taking the child with them; that they gave
her medical attention; and played with the child.

Valentine Grivel was called as a witness, but was not
sworn. She told her name; said that she was nine years
of age; told her birthday; said she attended school; that
she lived in Lincoln with the Youngs; named her teachers;

stated that she took music lessons and dramatic art instructions since living with the Youngs; that the Youngs were good to her; that she wanted to live with them; that she often visited her brothers; that the respondents play games and read rhymes to her; and she called Mr. Young "Daddy" in speaking of him.

The respondents rested their case by recalling Mrs. Young, who testified as to some of Valentine's dresses, which were brought into the courtroom, but which were refused to be admitted in evidence as exhibits.

This unusually extended recital of the facts disclosed by the record in this case, we feel, is justified by the peculiar nature of the questions to be determined by this court.

It may be said that analysis reduces relator's contentions to the primary one, that in this case, in view of the record, questions of fact and law presented by the respondents in their answer are all foreclosed by his appointment as guardian by the county court for Nemaha county. And even if it were otherwise, the best interests of the minor will be promoted by awarding him the custody of his ward. He relies upon, as controlling, our statutory provision: "If the minor have no father or mother living, and competent to have the custody and care of the education of such minor, the guardian so appointed shall have the custody and tuition of his ward." Comp. St. 1929, sec. 38-108. He further cites, and quotes from, as sustaining his contention, 12 R. C. L. 1119, which, in substance, as a general proposition, supports his view, and establishes as a principle that to the person of the ward the guardian stands in *loco parentis*.

But, if we continue the quotation from 12 R. C. L. 1119, we have also the following: "He (the guardian) may enforce this right (of custody) by habeas corpus proceedings, or by proper action in equity. The right of the guardian to the custody of the ward exists, however, solely for the latter's benefit, and may be regulated, controlled or denied by the courts when necessary to the promotion of the best interests of the ward." 12 R. C. L. 1119, sec. 21. See *Townsend v. Kendall*, 4 Minn. 412, 77 Am. Dec.

534; *Wood v. Wood,* 5 Paige Ch. (N. Y.) 596, 28 Am. Dec. 451; *Armstrong v. Armstrong,* 192 N. W. (Ia.) 146; *Dunn v. Jackson,* 231 S. W. (Tex.) 351.

So, also, in the words of another recognized authority: "The right of the guardian to custody of the ward is not an absolute one, but the matter of custody is subject to control by the court, which may deprive the guardian of such custody, or refuse to take the child from the custody of others and commit it to the custody of the guardian, the controlling consideration in the matter of custody, as in the matter of selecting the guardian, being the best interests of the child." 28 C. J. 1110.

"Every child born in the United States has, from the time it comes into existence, a birthright of citizenship which vests it with rights and privileges, entitling it to governmental protection, 'and such government is obligated by its duty of protection, to consult the welfare, comfort, and interests of such child in regulating its custody during the period of its minority.' *Mercein v. People,* 25 Wend. (N. Y.) 64, 35 Am. Dec. 653." *In re Gould,* 174 Mich. 663, 679.

In matters of awarding custody, as well as in the selection of a guardian, the true interest of the infant is of paramount consideration. By this is meant his lasting good, and in making its disposition of the matter the court will take into consideration not merely the temporal welfare, but the state of the minor's affections and attachments, and his training, education (secular and religious) and morals. 28 C. J. 1075.

While the wishes of a child under the age of fourteen years are not controlling where in conflict with what the courts regard as the minor's best interest, still, "Even though an infant is under the age of fourteen, if he has reached an age sufficient to enable him to form an intelligent preference, it is proper that his wishes should be consulted in connection with the selection of a guardian." 28 C. J. 1077. And this is also true upon matters of custody involved in the exercise of the guardian's powers for even more cogent reasons. This principle is certainly in

accord with dictates of justice and common humanity. *Brown's Estate*, 166 Pa. St. 249; *In re Gould*, 174 Mich. 663; *Knochemus v. King*, 193 Ia. 1282; *Dunn v. Jackson*, 231 S. W. (Tex.) 351.

The record, as well as the statements of counsel at the bar of this court on argument of the case, challenge our attention that the effect of the judgment appealed from will be to remove the minor from the custody of those who are now, and have been, sympathetically causing this minor to be properly instructed in the religious faith of her fathers, and vesting it in a party adhering to a creed substantially and fundamentally opposed to the minor's religious beliefs and to instructions so far received. There is not the slightest indication in the record that a suitable person of the faith preferred by the parent may not be easily found, nor are there any things connected with the minor's estate or circumstances that indicate that personal qualification of the present guardian are of particular value. The general rule appears to be: "The religious views of the parents of the child, and their wishes as to his religious training and environment, should, however, be taken into consideration in the selection of a guardian. * * * Where there is a difference of religious preference between a father and mother, in the absence of other controlling consideration, a guardian of the father's religious views will be appointed, certainly where the child expresses a desire to continue in the faith of his father." 28 C. J. 1077, 1078.

In Nebraska, legislative action has substantially adopted this principle, and established it as a public policy applicable to guardianship and custody of minors. It was entitled "An act to regulate the treatment and control of dependent, neglected, and delinquent children," and was enacted as chapter 59, Laws 1905. It defines a "dependent child" as one who is "under the age of sixteen (16), who for any reason is destitute or homeless or abandoned, or dependent upon the public for support, or has not proper parental care or guardianship." Section 15 thereof provides: "The court in committing children under the pro-

visions of this act, shall place them as far as practicable in the care and custody of some individual holding the same religious belief as the parents of said child, or with some association which is controlled by persons of like religious faith of the parents of the said child."

Certainly this plain recognition, by an authoritative agency of the state, of the principle just referred to, and its solemn pronouncement thus made, constitutes a proper and appropriate declaration of public policy on the subject to which it relates, so far as within the reason which its words suggest. Indeed, it must be conceded that the public policy of a state finds its highest source, as well as its most authoritative declaration, in its Constitution, in its laws, and in the decisions of its courts. 50 C. J. 857, 858.

These great principles thus recognized, which we have discussed, are in harmony with the care, sympathy and protection extended by the policy of the law to orphaned minors. They are truly favorites of the law. To them the law is not only protective, fair, and just, but truly merciful as well. For, save when in the presence of unavoidable necessity, it never countenances the adding of a single drop to that cup of sorrow and bitterness that circumstances unescapable have presented to its wards. It constantly guards with care and protects with unwearied fidelity its helpless charges against the errors, infirmities, ambitions, and cupidity of men, as well as against the manifest failure of judicial process.

Without announcing it as having the force of a binding rule in this jurisdiction, it may be said, in the discharge of this high trust and duty, American courts of excellent standing unquestionably adhere to the principle that, "So far as the interests and rights of the child itself are concerned the court is not bound by any previous adjudication." 10 Standard Ency. of Procedure, 953.

This jurisdiction, however, is fully committed to the doctrine that in a habeas corpus proceeding for the custody of a child of tender years, such as here presented, the general rule that the controlling consideration is the

child's own best interest applies. *Schroeder v. State,* 41 Neb. 745; *State v. Porter,* 78 Neb. 811; *In re Burdick,* 91 Neb. 639; *State v. Bryant,* 95 Neb. 129; *State v. Highberger,* 103 Neb. 258; *State v. Mason,* 179 Minn. 472.

On the question of scope of review and procedure permissible in this case at this time, there would seem to be no difficulty. In *Jensen v. Sorenson,* 233 N. W. (Ia.) 717, 723, we find the following language employed: "Where the issue turns upon the best welfare of the child and involves the overturning of presumptive parental rights in the interest of the child, we have found it difficult to separate questions of law from questions of fact, and have found ourselves unable to adhere very strictly to the rule contended for by appellee. We have necessarily recognized the fact that the determination of such issues carries us into the field of equity, and that it is indispensable that principles of equity be applied. In our recent case of *Barnett v. Blakley,* 202 Ia. 1, we said: 'As now used and recognized, in cases involving the custody of children, the writ of habeas corpus operates to invoke the broad powers of the court of an equitable nature to determine the question of custody of a minor child according as the welfare and best interests of the child may require, having due regard to the legal rights of parents, or others.'"

We have no disputed facts before us. Substantially they are admitted, and we are to consider them solely with an eye to the minor's best interests and happiness. Do Paul Bize and his good wife love this child? If taken to their home, will she share an equal place in their hearts with their son of 28 years, their son of 26, and their daughter of 22? Will their sons and daughter receive her into that family as a little sister? Or, will she be doomed to remain as a stranger in the household, tolerated and retained through a sense of responsibility, of charity, and of duty? True, she will receive her schooling at a public school, a mile and a half distant on a public road over which she will be required to proceed daily, be the weather fair or foul. Will the religious teaching imparted to her in her natural home by her natural parents before they passed

to the beyond be sympathetically cherished, encouraged and developed? In view of the full situation already detailed, will her own brothers be welcomed and encouraged to visit her at a place where the members of her family were strangers while the father and mother lived, and to which these brothers strenuously objected to her being taken after their parents' death?

On the other hand, take the facts supporting the respondents. This evidence discloses, without contradiction, that the Youngs are both in the early thirties, and unusually well-fitted to rear this little girl. They are a young couple, of good moral standing. They took this little orphan into their home as their own child. For two years they have admittedly surrounded her with the fostering care that a child of such tender years should have, in a manner which would reflect credit upon natural parents. They have clothed her well; they have had her tonsils removed, teeth attended, and eyes fitted with glasses; they have kept her in school, and she has received private instructions in music and dramatic art, all at their own cost and expense. They take her to see her brothers, and leave and encourage her to write to them; they are teaching her to love and remember them. They are sympathetically having her trained in the faith of her fathers.

Indeed, Mr. and Mrs. Young care for and love this child as their own; she accompanies them when they go places; and the little girl loves them as parents. She is happy; she calls them "Daddy" and "Mother," and she wants to remain with them. By none in the household is she deemed an interloper or intruder. They not only are desirous that she stay, but have offered to, and are willing to, adopt her and make her as their own in law and in fact. The situation for the minor is ideal. Truly, in the Young home, in the language of Justice Rose, employed in *In re Burdick,* 91 Neb. 639: "At the time of the trial the child's happiness and welfare were assured, for the present at least. To make a change would be an experiment at best"—and would deny her just rights conferred upon her even as a minor, by the policy of the law, and for which the entire

evidence discloses not the slightest justification for failure to respect and to accord.

The undisputed facts of this record clearly disclosing that the best interests of the minor will be promoted by her continuing in the custody of the respondents, which will also be in accord with the announced public policy of this state, and further disclosing that the judgment entered in the trial court is contrary to the preponderance and weight of the evidence, the district court erred in awarding the custody of the minor to the guardian herein.

Therefore, said judgment entered in the district court is reversed at the costs of the relator, and the proceedings dismissed.

REVERSED AND DISMISSED.