In re In the Interest of J.L.H., a Minor.

Felicitas MORENO, Appellant,

v.

JUVENILE OFFICER, Respondent.

No. WD 33493.

Missouri Court of Appeals,
Western District.

Jan. 11, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied March 1, 1983.

Application to Transfer Denied
April 26, 1983.

John P. Ryan, Jr., Kansas City, for appellant.

Alan B. Slayton, Independence, for respondents James L. Jones and Barbara Jones.

Evalyn R. Lee, Kansas City, for respondent Juvenile Officer of Jackson County, Mo.

Candace Zierdt, Legal Aid of Western Missouri, Kansas City, Guardian Ad Litem for J.L.H., respondent.

Before NUGENT, P.J., and TURNAGE and LOWENSTEIN, JJ.

LOWENSTEIN, Judge.

On July 17, 1981, J.L.H. then approximately 2½ years old, lost both his parents when the skywalks in the Hyatt Regency Hotel, Kansas City, Missouri, collapsed. James and Barbara Jones have had custody of J.L.H. since July 20, 1981. In early December, 1981 a hearing was held in the Juvenile Court of Jackson County where the Jones', unrelated to J.L.H., sought custody as did the child's maternal grandmother Felicitas Moreno. The court's order was to continue custody with the Jones and the grandmother appealed to this court.

The child's father, Tom Henson, a caucasian was age 46 at the time of his death. He was apparently a Baptist. He had been married previously, that marriage had produced five children, all emancipated, four of whom lived in Kansas City at the time of his death.

The child's mother Romilia Henson was 28, a Catholic from Del Rio, Texas. She was a Mexican-American who came to Kansas City when she married Tom Henson. There was no evidence she had practiced her religion after her marriage.

Mrs. Moreno, the maternal grandmother, is 49, was born in Mexico and is still a Mexican citizen although living in Del Rio, Texas since 1962. She has a permanent passport. She is divorced, a Catholic, has little formal education and does not speak English. Living with her is a 15 year old adopted daughter, Olga. She owns her own home in a lower economic area of Del Rio (just across the United States-Mexican border). She works in a motel on a 40 hour a week basis for $2.95 an hour. She receives $60 a month from her former husband for Olga.

Mr. Jones is 35 and works for a construction company. His salary is $500 a week. Mrs. Jones, age 32 has been married to her husband for approximately 7 years. They have a 4 year old daughter. They live in a log cabin style home in a wooded area of Independence, Missouri. Both attended college. Mrs. Jones has a teaching certificate. She does not work. The Joneses are active members of the Reorganized Church of Latter Day Saints (RLDS).

J.L.H. is rather large for his age and is apparently in good health. He has lived his entire life in the Kansas City metropolitan area. With his mother he visited Mrs. Moreno three times in Del Rio. The day before his parents died J.L.H. and his mother had been to an RLDS church social and J.L.H. became enamored with and followed around a lady at that function. That lady is Mrs. Jones. The child speaks English, he does not speak Spanish. He was baptized a Catholic during a visit to Del Rio. Except for one, all his half brothers and sisters live in the Kansas City area.

The Joneses had initiated guardianship proceedings following the Henson's death, but when the juvenile officer filed a petition for detention (and to determine custody) under Chapter 211.011 RSMo 1978[1] et seq. the Joneses then sought custody as did the grandmother.

1. All statutory references are to Revised Statutes of Missouri 1978.

The social study from the Missouri Division of Family Services on the Joneses' home recommended that home for J.L.H.'s custody since he had "bonded" to the atmosphere there, *i.e.,* he refers to Mrs. Jones as mother and gets along well with the Joneses' four year old daughter. The report also indicated the Joneses for custody since the child spoke only English; it also noted they are in good health. Mrs. Jones has a sister who teaches Spanish. Mrs. Jones is home every day except one when she teaches school. The Missouri authorities did not interview Mrs. Moreno when she was in Kansas City for the reason she did not speak English.

The Texas Department of Human Resources interviewed and recommended the grandmother. The evidence showed Mrs. Moreno works in the kitchen and laundry of a motel. Two days a week her hours are 7:00 a.m. to 3:00 p.m. and three days a week from 3:30 p.m. to 11:00 p.m. Her sister-in-law would be available for babysitting duty. She has worked at the motel for 8 months. Prior to that she had gone to Denver taking Olga out of school in Del Rio and enrolling her in a school in Denver while Mrs. Moreno took a factory job there. That employment ended 3 months later in March of 1981 when she returned to Del Rio. In 1980 she had no formal job but made blankets in her home. She has been divorced and single since 1972. She has $150 in savings. Her only contact with J.L.H. had been the three times his mother brought him to visit her. She had used an interpreter to talk to him on long distance calls. Del Rio, Texas is one half Mexican-American.

Appellant Mrs. Moreno's first point of error contends that the trial court erred in placing J.L.H. with the Joneses because the custody of the child was not committed to a person or persons of the same religious faith as the parents of the child and such placement order is in violation of Section 211.221.

The mother of J.L.H. was Catholic, his father a Baptist, J.L.H. was baptized as a Catholic, the Jones family are members of the Reorganized Church of Latter Day Saints. Appellant is Catholic. Section 211.221 states:

*Religion considered in placing child.* In placing a child in or committing a child to the custody of an individual or of a private agency or institution *the court shall whenever practicable* select either a person, or an agency or institution governed by persons of the same religious faith as that of the parents of such child, or in case of a difference in the religious faith of the parents, then of the religious faith of the child or if the religious faith of the child is not ascertainable, then of the faith of either of the parents. (Emphasis added.)

Appellant's other point declares the trial court's custody order was not in the best interest of J.L.H. primarily because J.L.H. was not placed with his grandmother, his only blood relative and was against the weight of the evidence. Both her points will be considered together.

The trial court determined from the evidence presented that the Joneses' home offered a more stable home environment, a better economic environment, a two-parent household (as opposed to a single-parent home); a sibling close in age to J.L.H. with whom J.L.H. has developed a close "bonding" over the past year and one half; persons with whom J.L.H. has developed a close "bonding"; a mother who stays at home with J.L.H. and who provides him with supervision and training as opposed to a mother (appellant grandmother) who would admittedly have to "farm out" the child to relatives for a good portion of each day, and who does not speak the language in which J.L.H. responds to direction and guidance.

With regard to the ethnic background of the child (½ Mexican-American, ½ Caucasian) the court felt the placing of custody with the Joneses "balanced" things out. The court reasoned the same way on the religious issue—since the parents were of two different religions both of which were of the Christian faith, the placement in the Joneses' home was not considered out of order. The court also gave weight to the

Joneses being younger in age than the grandmother. It felt the child has adjusted well to the Joneses, was used to the Kansas City area, and would have his half brothers and sisters close by. The order committed custody of J.L.H. to the Joneses with reasonable rights of visitation to the grandmother, her family and the child's half brothers and sisters. It noted the situation and environment of the Joneses and the grandmother was not equal and therefore it was not practicable nor in the child's best interest to place him with the grandmother.

■ The review of the judgment in a court tried case is governed by Rule 73.01 and *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976), and should be set aside only if there is no substantial evidence to support it, was against the weight of the evidence, or erroneously declared or applied the law. The trial court is in a better position to judge the sincerity and character of the witnesses, *E_____ (S_____) v. E_____,* 507 S.W.2d 681, 684 (Mo.App.1974), and there is a presumption the trial court studied the custody matter carefully, found in the best interest of the child and its judgment will not be disturbed unless the welfare of the child requires some other disposition, *Fastnacht v. Fastnacht,* 616 S.W.2d 98, 100 (Mo.App.1981); *Wells v. Wells,* 623 S.W.2d 19, 22 (Mo.App.1981).

■ Two of the half sisters had originally filed for guardianship of J.L.H. following the accident. That pursuit was dropped, and in fact, several of J.L.H.'s half brothers and sisters testified in favor of the granting of custody to the Joneses. At the custody hearing the grandmother was represented as were the Joneses. Also present was an attorney for the juvenile officer and an attorney from Legal Aid of Western Missouri appointed as guardian ad litem for J.L.H. The juvenile officer and guardian ad litem did not appeal the trial court's

order. The Joneses have filed a motion to dismiss the Moreno appeal on jurisdictional grounds for its not being in compliance with § 211.261 RSMo 1978. This section identifies the individuals entitled to take appeals on behalf of the child under the juvenile code.[2] The Notice of Appeal filed by Mrs. Moreno does not state she is taking the appeal on the part of or on behalf of the child. Appeals in juvenile proceedings, as in other cases, are purely statutory in origin and require strict compliance with the statutes. *State v. Jahnke,* 221 Mo.App. 366, 273 S.W. 155, 156 (Mo.App.1925). Despite the fact that this precise language is not in this Notice of Appeal, in an effort to determine this matter on its merits, the court treats the grandmother's appeal as a bonafide attempt at and in substantial compliance with § 211.261, thus vesting this court with jurisdiction. *In Re C_____,* 314 S.W.2d 756, 759 (Mo.App.1958). *See also In Interest of R.L.P.,* 536 S.W.2d 41, 43 (Mo.App.1976); *Ozark Border Elec. Co-op v. Stacy,* 348 S.W.2d 586, 591–92 (Mo.App.1961). The admonition of *In Re C_____, supra,* at 760 to comply with the statute on appeal, is in the case repeated. Mrs. Moreno is a party and as J.L.H.'s grandmother is a relative and therefore one of the enumerated persons to appeal on his behalf, *In Re Steven,* 570 S.W.2d 349 (Mo.App.1978). *Cf. In Interest of Beste,* 515 S.W.2d 530, 533 (Mo. banc 1974); *Matter of Baby Girl B_____,* 545 S.W.2d 696, 697 (Mo.App.1976); *State ex rel. Killoran v. Calhoun,* 201 Mo.App. 374, 211 S.W. 109, 110 (Mo.App.1919).[3] The motion to dismiss is denied.

The effect of § 211.221 and the importance of matching the custodian's religion with that of the child's parents will now be addressed. In evaluating the effect of this statute it should be noted that the guiding light for determining custody is the idea of doing what is in the best interests of the

**2.** The pertinent part of § 211.261 reads: "An appeal shall be allowed to the child from any final judgment, order or decree made under the provisions of sections 211.011 to 211.431 and may be taken on the part of the child by its parent, guardian, legal custodian, spouse, relative or next friend."

**3.** *In the Interest of T.P.S.,* 595 S.W.2d 320 (Mo. App.1980), and in *Interest of R_____,* 362 S.W.2d 642 (Mo.App.1962) represent jurisdictional questions relating the timeliness of filing the Notice of Appeal.

child.[4] In Missouri, "[T]he law is firmly established that in determining the question of a minor child's custody the welfare of the child is the supreme and controlling situation." *Parks v. Cook,* 180 S.W.2d 64, 68 (Mo.App.1944); *Brewer v. Cary,* 148 Mo. 193, 127 S.W.2d 685 (1910).[5] The difficulty occurs in determining what factors go into the determination of this nebulous, "best interests of the child" test, and a determination as to whether the consideration of religion as contained in § 211.221 mandates a result. Note, *Religion—A Factor In Awarding Custody of Infants?,* 31 S.Cal.L. Rev. 313 (1958). Legal writers have opined that this test really means isolating the three broad component categories of economic, psychological and social benefits to determine what is in the child's best interest. Note, *Religion As A Factor In Adoption, Guardianship And Custody,* 54 Colum.L.Rev. 376 (1954).

The majority of the states have religious "protection" or "matching" statutes governing the area of child placement. List, *supra,* Note 5; Note, Colum.L.Rev. *supra;* Pfeffer, *Religion In The Upbringing Of Children,* 35 B.U.L.Rev. 333 (1955); Annot. 48 ALR3d 383 (1973). The Missouri statute is typical of most laws on this subject. The interpretation of these statutes may be characterized as falling into three categories, mandatory, discretionary and advisory. New York is the most stringent, this provision is contained in the state constitution, *id.* at 372, and the religious factor is mandatory. In New York the provision must be literally followed and if the decree of custody is to someone not of the child's religion, reasons must be given. Note, 54 Colum.L. Rev. *supra,* at 379–82. Massachusetts uses the word "must" instead of "shall" as to the

religious imperative and the statute is generally interpreted the same as New York's. List, *supra,* Note 4, at 24. What has been described as the discretionary interpretation has been the approach taken by the courts in Illinois and Pennsylvania, *id.* at 23–24, where the best interest test is read together with and in conjunction with parental rights or wishes. Note, Colum.L.Rev. *supra,* at 376, 388.

In the third approach, denominated as the Missouri interpretation, statutes are given little weight or are construed as merely advisory. List, *supra* at 22; Note, Colum.L. Rev. *supra,* at 386. The watchword in Missouri is not the religious protection statute but the best interest test, and affords custody to a person of the parent's religion only if it is in the best interest of the child. Case law in Missouri makes the temporal welfare of the child the primary and controlling test in custody matters. In *State ex rel. Baker v. Bird,* 253 Mo. 569, 162 S.W. 119, 124 (1913), involving guardianship for those not of the same faith as the parent of the minor (child baptized in parent's faith), our supreme court held that Missouri's former religious matching statute was "clearly directory" and only advisory. The court said when potential guardians of the same religious faith as the ward's parents who were as good in terms of "morals and ability" as persons not of the same faith, then they should be appointed "but the moral, social and financial welfare of the minor are paramount to it's religious instruction." On page 125 of the opinion the court rejects the mandatory rule of New York and reasons that under Missouri's Constitution and laws, religion could not be used as a factor in revoking guardianship.[6] This longstanding belief by our courts that the granting or

---

4. The "best interests" of the child, the primary and sometimes exclusive test developed from *Chapsky v. Wood,* 26 Kan. 650 (1881). *See* List, *A Child and A Wall: A Study of "Religious Protection" Laws,* 13 Buffalo L.Rev. 9, 15 (1963).

5. "Temporal welfare" has been used synonymously with "best interest" List, A Child And A Wall: A Study Of "Religious Protection" Laws, 13 Buffalo, L.Rev. 9, 15 (1963).

6. *See* Pfeffer, *supra* at 368, "where both parents are dead and lawful custody is in a nonparent, a reasonable argument might be made that a secular court is likewise constitutionally forbidden to effectuate those wishes against the will of the lawful custodian and the temporal interests of the child."

taking away of custody based solely on religious beliefs would transgress the state's policy of religious liberty [7] was reiterated in *Brewer v. Cary, supra,* at 692, wherein a antenupital contract for religious upbringing was not enforced as to a guardian. *Brewer* held that Missouri courts could not tell a guardian how to provide religious training for his ward. Custody was based upon which placement would best advance the interest of the child. *In Re Laura Doyle,* 16 Mo.App. 159, 166 (1884), noted that Missouri law as of 1884 forbade appointment of a guardian for an orphan where the guardian's religion is different from the surviving parent. The court interpreted this statute as not being made for establishment of religious training for children but with a sympathetic view to rights and feelings of the parents, (but only so far as the interests of the child are not injuriously affected). The religious statute could not be used to change guardians or justify a guardian transfer, *Parks v. Cook, supra,* at 69, and *Voullaire v. Voullaire,* 45 Mo. 602, 607 (1870). In *Voullaire* both parents each of a different religion were still alive and the guardians were of still another faith. In "looking to the good of the children", which is the primary object, the court noted that no one as qualified nor as suitable of the faith of the parents had applied for guardianship. *Id.* at 605. In an adoption case, *In Re Duren,* 355 Mo. 1222, 200 S.W.2d 343 (1947); the court held that the wishes of the last surviving parent should have great weight, but the practicalities and temporal considerations for the child came first.[8]

▮ In sum, the Missouri interpretation of its religious matching statute, § 211.221, as being advisory and directory is not only the majority view but preferred to the mandatory New York interpretation which the appellant here suggests. *Cooper v. Hinrichs,* 10 Ill.2d 269, 140 N.E.2d 293, 295–96 (Ill.1957). List, *supra* at 15; Pfeffer *supra,* at 370; 65 Harv.L.Rev. 694 (1952); Huard, *Law of Adoption: Ancient and Modern,* 9 Vand.L.Rev. 753 (1956).[9] The matter of religion may be a factor to be considered in determining custody under Chapter 211, Note 21 S.Cal.L.Rev. *supra,* at 319; Pfeffer *supra,* at 364; List *supra,* at 15. *See e.g., In Re Adoption of "E",* 59 N.J. 36, 279 A.2d 785, 792 (N.J.1971) (in adoption proceedings religion may be a factor, but it alone cannot permit a court to ignore other relevant factors). But the statutory directive of § 211.221 tips the scale only when the temporal interests are in balance. Huard *supra,* at 755. "Assuming that the 'welfare' of the child is the aim of the proceedings, religion alone should not be sufficient to outweigh all other factors such as the security and love a child may have found in a foster home." Note, 65 Harv.L.Rev. 694, 695 (1952).[10] The net effect of giving the religious matching portion of § 211.221 mandatory effect is to take any option out of the trial judge's decision as allowed in the lan-

7. Note, Colum.L.Rev. *supra,* at 386; List, *supra,* at 22.

8. Since custody and placement of a child under Chapter 211, such as under the circumstances here, where a child is left homeless for placement for care, protection and discipline is less permanent than an adoption, there is even less need for religious matching with deceased parents. Most of the writers in this area make no distinction—they say the religious factor is always advisory only.

9. *State ex rel. Bize v. Young,* 121 Neb. 619, 237 N.W. 677 (Neb.1931); Broeder, Barrett, *Impact of Religious Factors in Nebraska Adoptions,* 38 Neb.L.Rev. 641, 652 (1959); *In Re Walsh's Estate,* 100 Cal.App.2d 194, 223 P.2d 322, 325 (Cal.App.1950), (welfare of child, financial stability, past history, character, etc.) of primary importance in selection of guardian—statutory provision not mandatory, *In Re Guardianship of Walsh,* 114 Cal.App.2d 82, 249 P.2d 578, 580 (Cal.App.1952)); *Clift v. Clift,* 346 So.2d 429, 434–35 (Ala.App.1977) (Religion can't be sole basis in awarding custody, income, stability, and time for supervision important); *Morris v. Morris,* 271 Pa.Super. 19, 412 A.2d 139, 144 (Pa.Super) (religion not sole criteria, parental rights must yield to welfare of child or "best interest" becomes a hollow shiboleth); *Flannery v. Bolton,* 27 Colo.App. 39, 146 P. 489, 491 (Colo.App.1915).

10. *Commonwealth ex rel. Bendrick v. White,* 403 Pa. 55, 169 A.2d 69, 73 (Pa.1961); *State ex rel. Strachota v. Franz,* 166 Wis. 32, 163 N.W. 191–92 (Wis.1917).

guage, "The court *whenever practicable.*" (Emphasis added.) The judge would lose any discretion in cases such as this as the potential custodian of the same religion could demand custody as an absolute right.[11]

A statute on religious protection should not make us forget nor lose sight of placing temporal welfare of the child as the highest commandment.

> "In the balance in such a proceeding is the future of an infant human being, neither good nor bad, . . . desired by other people, a little child about whom precious little is known and for whom a court must make a decision which in large measure will chart the course of his life, irrevocably, for however long he lives."

List, *supra* at 34.

While continuing the declaration of § 211.221 as being only advisory or directory it should be further noted that due to the age of J.L.H. (2½ when his parents died) there was no evidence of any previous formal religious training in Catholicism other than his baptism. Therefore, there should be no negative impact on the child if he were raised in the faith of the Jones while in their custody. Pfeffer *supra,* at 377; List *supra,* at 16. Also, as correctly noted in the trial court's findings only one of the parents' religion was Catholic and since the religion of the custodians' RLDS, comes within the umbrella of Christianity there in effect has been no change of religion by the judgment. *Cf. Brewer v. Cary, supra.* Also, not surprisingly here under the circumstances, the mother and father of J.L.H. made no provision for his religious upbringing nor for the appointment of a guardian in case of their deaths.

In assessing the evidence as to which home provided the best placement to provide for J.L.H.'s best interests and keeping in mind the broad component categories of economics, psychological and social aspects of the evidence, exclusive of the religious issue, the record as a whole points to the Jones' home as being the most favorable.

■ *In Re G_____,* 389 S.W.2d 63 (Mo. App.1965), which involved a natural mother and grandmother vying for custody although the grandmother had cared for the child and her love for it was not questioned, the court noted she was separated, working six days a week until 11:00 p.m. and would have to farm the child out after school, plus her age (50) and that she had moved several times all mitigated against her. In this case the additional factors of the language problem, separation from half brothers and sisters, the "bonding" between the child, the Jones and their daughter that had developed for a year and a half, and the more favorable economic situation and stability of the Joneses provide substantial evidence supporting the trial court's decision under the rule in *Murphy v. Carron, supra.*

■ The Joneses have provided a good environment and a stable home, this being considered by Missouri courts as the most important single consideration in custody cases. *Rogers v. Rogers,* 430 S.W.2d 305, 311 (Mo.App.1968); *Ackfeld v. Ackfeld,* 483 S.W.2d 614 (Mo.App.1972). The fact that the Joneses have provided good care is a factor to be considered, *Matter of M.D.H.,* 595 S.W.2d 448, 450–51 (Mo.App.1980), *In Re Adoption of K.L.G.,* 639 S.W.2d 619, 627 (Mo.App.1982). There has been "bonding" with the Joneses family, *Matter of M.D.H., supra,* at 450. The Joneses provide a two-person home with one person being available for supervision during the day. *Adoption of H_____,* 69 Misc.2d 304, 330 N.Y.S.2d 235 (1972); *J v. R,* 446 S.W.2d 425, 428 (Mo.App.1969). The Joneses also are younger than the grandmother. *Matter of M.D.H., supra* at 451; *J v. R, supra,* at 428; Annot. 84 ALR3d 655 (1978). All things were not equal between the prospective custodians, thus the religious factor as well as the grandmother's additional allegation that she be given preference as a blood relative do not apply. The cases cited by the grandmother giving a relative prefer-

---

**11.** *See In Re George,* 630 S.W.2d 614, 621–22 (Mo.App.1982) for a concise and helpful expla-

nation of defining "judicial discretion" and appellate review of the exercise thereof.

ence as a guardian over a stranger both allow such a preference only when all other things are considered.[12]

The grandmother makes no complaint as to the fitness of the Joneses, *In Re Dixon,* 254 Mo. 663, 163 S.W. 827 (1914). This court appreciates her candid statement in her brief that there is substantial evidence to support the trial court's finding on this point. As was said in *Baker, supra:*

> "When a child is legally placed in a home where it receives good treatment and moral training it should never be removed from that home, except for the most cogent reasons." [13]

162 S.W. at 124.

Since, "the statutory directive tips the scale only when the temporal interests are in balance[.]" Huard *supra,* at 755, § 211.-221 would be invoked here because of the assessments and recommendations of the juvenile officer and the guardian ad litem characterizing the fitness of the two homes as being equal or a "toss-up".[14] If the evidence here truly added up the Joneses' home and the Moreno home being genuinely equal the statute would tip the scale in favor of the grandmother. Seldom is there a true toss-up between the competing interests to provide a home for a child. One is usually better than the other—and that is not to denigrate the side that doesn't "win". On the evidence here the Joneses are better able to provide a custodial home for J.L.H. than is his grandmother. This does not disparage Mrs. Moreno nor stamp her unfit.

The judgment merely recognizes that between the two well-intentioned and well-qualified homes the Joneses represent the better of the two to provide for J.L.H.'s temporal interests. On this record, the trial court was correct in its findings and its evaluation and did what appears to be the right thing and the best thing for the interests of this unfortunate youngster. The scales here were not evenly balanced, and § 211.221 is not and should not be needed to tip them.

Even more disturbing than the juvenile officer and guardian ad litem's assessment of the evidence is their lack of effort in this whole proceeding. If persons appointed as guardian ad litem sit back at trial and let two competing interests fight it out for custody, the best interests of the child are not necessarily being protected.[15] Likewise when a juvenile officer represents that all things are equal after having been inert at trial, non-committal as to a recommendation, with only the suggestion that an in-state custodian would be easier to monitor than an out-of-state one, he begs the issue and does not necessarily represent the child's best interests. *In Re Estate And Guardianship of Levy,* 137 Cal.App.2d 237, 290 P.2d 320, 327 (Cal.App.1955). From the transcript here it is difficult to see what the guardian ad litem contributed to determing what here was best for J.L.H. Even though the court would not be bound by the opinion or recommendation of the guardian ad litem, *Brooks v. Division of Children's*

---

12. *In Re Brinckwirth's Estate,* 268 Mo. 86, 186 S.W. 1048, 1052 (Mo. banc 1916); *Roots v. Reid,* 555 S.W.2d 54, 57 (Mo.App.1977). *See also* Note, Vand.L.Rev. *supra,* at 762–63, for a candid proviso on adoptions by blood relatives—the best interests of the child must be closely examined as between prospective adoptors.

13. *See State ex rel. Bize v. Young, supra,* at 684, "where the child had been with the guardians (who were in their early thirties) for two years and called them "Daddy" and "Mother" and they had treated the child "in a manner that would reflect credit upon natural parents[.]" The court said "at the time of trial, the child's happiness and welfare were assured, for the present at least. To make a change would be an experiment at best."

14. The guardian ad litem in closing argument stated: "... I'm really not prepared to make an argument. In order to argue, I think you have to think that one family is superior to the other, and as I sat here and listened to all the evidence, I can't say that I do."

15. *See* Levin, *Guardian Ad Litem In A Family Court,* 34 Maryland L.Rev. 341 (1974); *S——— v. S———,* 595 S.W.2d 357, 361 (Mo.App.1980). *See also* Speca and Wehrman, *Protecting The Rights of Children in Divorce Cases in Missouri,* 38 U.M.K.C.L.Rev. 1 (1969); *Protecting the Interests of Children in Custody Proceedings, A perspective of Twenty Years of Theory and Practice in the Appointment of Guardians Ad Litem,* 12 Creighton L.Rev. 234 (1978).

*Services,* 411 S.W.2d 276, 282 (Mo.App. 1967), it is imperative that the guardian ad litem, investigate and have input on the perspective of the child's best interest and this be presented to the trial judge. In this case the fact that the court based its order correctly and upon substantial evidence is not due to any effort of the guardian ad litem. By not cross-examining the grandmother for an explanation of her sudden trip to Denver and the necessity for changing schools for daughter, Olga, by not examining the Joneses on how they punished their child, and by not presenting a profile or an informed opinion of the psychological effect on J.L.H. of changing homes, cities, custodians and cultures resulting from the proposed transfer to the grandmother; present several examples of investigation and information that should have been presented to the juvenile judge by the guardian ad litem. The answer given by a computer can be no better than the sum of information fed into it. If the juvenile judge must be guided by the standard of what is in the best interest of the child so must those in our system whose duty it is to make the system work.

 Our supreme court in *Hemphill v. Hemphill,* 316 S.W.2d 582 (Mo. banc 1958), said the guardian should use the same if not greater attention and vigilence in the action as he would have for a sui juris defendant (there client was insane). The court stressed that an intelligent and effective defense of his client could only have been made after conducting a reasonable investigation of the facts. Likewise, the guardian ad litem in an adoption proceeding should be active in cross-examining witnesses and eliciting the facts bearing on the welfare of his ward. *In Re Mayernik,* 292 S.W.2d 562 (Mo.1956). *See also In Re G_____,* 389 S.W.2d 63, 66 (Mo.App.1965). In a follow up to *Hemphill, supra,* our supreme court said in *Hemphill v. Quigg,* 355 S.W.2d 57 (Mo.1962), "if a guardian ad litem is to err it should be on the side of investigating too much rather than too lit-

tle." The role of the guardian ad litem involves more than perfunctory and shadowy duties. *In Re M_____,* 446 S.W.2d 508, 518 (Mo.App.1969). The guardian ad litem is supposed to collect testimony, summon witnesses and jealously guard the rights of infants, which is the standard of duty in this state. *Spotts v. Spotts,* 331 Mo. 942, 55 S.W.2d 977 (Mo.1932).[16] It is the guardian ad litem's duty to stand in the shoes of the child and to weigh the factors as the child would weigh them if his judgment were mature and he was not of tender years. *Kennard v. Wiggins,* 349 Mo. 283, 160 S.W.2d 706, 712 (Mo.1941).

Though *Parks v. Cook, supra,* involved a modification of a custody decree as between a mother and father, the cautionary of the court there is apropos to all concerned here with J.L.H.:

> "The court's decree appears to be as just to all parties as it is possible to make a decree under the evidence herein. If both the father and mother, as well as the relatives on both sides, will take as their guiding principle the welfare of the boy, and conduct themselves in accordance with that principle in carrying out the court's orders, they will make an important contribution to the boy's happiness, and will, incidentally, contribute to their own peace of mind."

180 S.W.2d 70.

The trial court correctly assessed the evidence in determining that custody with the Joneses would be in the child's best interest.

This decision shall not be conclusive as to any future litigation involving this child.

The judgment is affirmed.

---

**16.** *Keating v. Jerde,* 472 S.W.2d 651, 654 (Mo. App.1971); *Morgan v. Morgan,* 289 S.W.2d 151

(Mo.App.1956); *Cox v. Wrinkle,* 267 S.W.2d 648, 651 (Mo.1954).